No. 26-7070

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**UNITED STATES OF AMERICA,**
*Plaintiff-Appellant*,
v.

**STATE OF CALIFORNIA; SHIRLEY N. WEBER**, *in her official capacity as California Secretary of State*; **DEAN C. LOGAN**, *in his official capacity as the County of Los Angeles – Registrar-Recorder/County Clerk*,
*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
No. 2:26-cv-1205-DOC-ADS

# EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR INJUNCTION PENDING APPEAL (RELIEF REQUESTED BY OCTOBER 24, 2026)

TODD BLANCHE
*Attorney General*
R. TRENT MCCOTTER
*Acting Deputy Attorney General*
JOHN K. ADAMS
*Associate Deputy Attorney General*
ANDREW M. DARLINGTON
*Counsel to the Assistant Attorney General*
950 Pennsylvania Avenue, NW
Washington, D.C., 20530
Telephone: (202) 532-0100
Andrew.Darlington2@usdoj.gov

BILAL A. ESSAYLI
*First Assistant United States Attorney*
JULIE A. HAMILL
*Assistant United States Attorney*
J. ROBERT RENNER
*Assistant United States Attorney*
300 N. Los Angeles St., Ste. 7516
Los Angeles, California 90012
Telephone: (213) 894-2464
E-mail: Julie.Hamill@usdoj.gov

Attorneys for Plaintiff-Appellant
United States of America

## TABLE OF CONTENTS

Page

INTRODUCTION .......... 9

STATEMENT .......... 11

A. The Federal Government is likely to prevail on the merits of its as-applied challenge. .......... 23

B. The other injunction factors strongly favor the government .......... 33

CONCLUSION .......... 36

# TABLE OF AUTHORITIES

**PAGE(s)**

## Federal Cases

*A.A.R.P. v. Trump*,
605 U.S. 91 (2025) .......... 7, 22

*Allen v. Milligan*,
608 U.S. 511 (2026) .......... 30

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) .......... 35

*Anderson v. United States*,
417 U.S. 211 (1974) .......... 8, 10, 11

*Arizona v. United States*,
567 U.S. 387 (2012) .......... 24, 23, 24, 26, 29

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .......... 33, 34

*City of Richmond v. J.A. Croson Co.*,
488 U.S. 469 (1989) .......... 27

*Mich. Canners and Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining Bd.*,
467 U.S. 461 (1984) .......... 25, 30

*Virginia Off. for Prot. & Advocacy v. Stewart*,
563 U.S. 247 (2011) .......... 27

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) .......... 23, 24, 25, 29

*Daimler Truck N. Am. LLC v. California Air Res. Bd.*,
2025 WL 3049944 (E.D. Cal. Oct. 31, 2025) .......... 26, 34

*Ex parte Young*,
209 U.S. 123 (1908) .......... 25, 27

*Feldman v. Arizona Sec'y of State's Off.*,
843 F.3d 366 (9th Cir. 2016) .......................................................... 22, 23

*Golden State Transit Corp. v. City of Los Angeles*,
475 U.S. 608 (1986) .......................................................................... 25

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ............................................................................ 25

*Kansas v. Garcia*,
140 S. Ct. 791 (2020) ........................................................................ 23

*Livadas v. Aubry*,
987 F.2d 552 (9th Cir. 1991) .......................................................... 25, 26

*Livadas v. Bradshaw*,
512 U.S. 107 (1994) .......................................................................... 25

*Maryland v. King*,
567 U.S. 1301 (2012) ........................................................................ 34

*Mut. Pharm. Co. v. Bartlett*,
570 U.S. 472 (2013) .......................................................................... 27

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*,
491 U.S. 350 (1989) .......................................................................... 33

*Norwood v. Harrison*,
413 U.S. 455 (1973) ............................................................... 24, 27, 29

*Puerto Rico v. Branstad*,
483 U.S. 219 (1987) .......................................................................... 25

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .............................................................................. 30

*Savage v. Jones*,
225 U.S. 501 (1912) .......................................................................... 23

*Supremacy Clause. United States v. Texas*,
557 F.Supp.3d 810 (W.D. Tex. 2021) ............................................... 34

*United States v. Missouri*,
114 F.4th 980 (8th Cir. 2024) ............................................................ 24

*United States. Abbott v. Perez*,
585 U.S. 579 (2018) .......... 34

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) .......... 33

*Winter v. NRDC*,
555 U.S. 7 (2008) .......... 22

**Federal Statutes**

6 U.S.C. § 252 .......... 12, 13, 14, 15

6 U.S.C. § 271 .......... 11

18 U.S.C. § 611 .......... *passim*

52 U.S.C. § 10307 .......... 20

**State Cases**

*Musta v. Mendota Heights Dental Ctr.*,
965 N.W.2d 312 & n.11 (Minn. 2021) .......... 24

**State Statutes**

Cal. Elec. Code § 2188 .......... 15, 16, 17, 19, 20

Cal. Elec. Code § 3000.5 .......... 28

# CIRCUIT RULE 27-3 CERTIFICATE

**1. The contact information of the counsel for all parties is as follows:**

*Counsel for Plaintiff-Appellant United States of America*

Andrew Michael Darlington
United States Department of Justice
950 Pennsylvania Ave NW
Washington DC, 20530
202-550-5305
andrew.darlington2@usdoj.gov

Julie Ann Hamill
United States Attorney's Office
300 N. Los Angeles St., Suite 7516
Los Angeles, CA 90012
213-894-2464
julie.hamill@usdoj.gov

John Robert Renner
United States Attorney's Office
300 N. Los Angeles St., Suite 7516
Los Angeles, CA 90012
213-894-2448
robert.renner@usdoj.gov

*Counsel for Defendants-Appellees State of California and Shirley Weber, in her official capacity as California Secretary of State*

Anne P. Bellows
California Attorney General's Office
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
415-510-3847
anne.bellows@doj.ca.gov

Michael Surren Cohen
California Department of Justice
1300 I Street
PO Box 944255
Sacramento, CA 94244
916-210-6090
michael.cohen@doj.ca.gov

Lisa Catherine Ehrlich
California Department of Justice
Office of the Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
415-510-3489
lisa.ehrlich@doj.ca.gov

Andrew Edward Kushner
California Department of Justice
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102-7020
415-268-4323
andrew.kushner@doj.ca.gov

Christina Marie McCall
California Department of Justice
Civil Division
1300 I Street
Sacramento, CA 95814
916-210-7890
christina.mccall@doj.ca.gov

*Counsel for Defendant-Appellee Dean C. Logan, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk*

Christopher K. Pelham
Norton Rose Fulbright US LLP
555 South Flower Street, 41st Floor
Los Angeles, CA 90071
323-892-9200
christopher.pelham@nortonrosefulbright.com

Alex Jordan Scandroli
Norton Rose Fulbright US LLP
555 South Flower Street, 41st Floor
Los Angeles, CA 90071
213-892-9200
alex.scandroli@nortonrosefulbright.com

Abigail Urquhart
Norton Rose Fulbright US LLP
555 South Flower Street, 41st Floor
Los Angeles, CA 90071-3103
213-892-9266
abigail.urquhart@nortonrosefulbright.com

Joshua Karsh
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
510-738-6788
joshua.karsh@publicrightsproject.org

Kyra Sikora
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
510-738-6788
kyra.sikora@publicrightsproject.org

Toby R. Merrill
Public Rights Project
490 43rd Street, Unit #115
Oakland, CA 94609
510-738-6788
toby.merrill@publicrightsproject.org

**2. Facts showing the existence and nature of the emergency:**

The United States files this emergency motion under Circuit Rule 27-3 for an injunction pending appeal to segregate—not to cancel—ballots cast by ineligible noncitizen voters that are currently being tabulated in the ongoing Federal election, contrary to Federal criminal law. 18 U.S.C. § 611. The Federal Government has identified over twenty thousand individuals who are "(1) registered to vote in California, (2)

were sent a vote-by-mail ballot, and (3) are highly likely to be noncitizen aliens." CR 62-2 (Declaration of Nicolas Bartell ("Bartell Decl.") at para. 25; CR 62-3 (Declaration of Eric McLoughlin ("McLoughlin Decl.") at para. 25. But California refuses to act and opposes even the simple step of segregating ballots by these individuals—some of whom have now been criminally charged with violating 18 U.S.C. § 611, which prohibits noncitizen voting in federal elections. *See* Press Release, Department of Justice *28 Foreign Nationals Arrested on Charges that they Illegally Registered and Voted* (October 19, 2026), *available at* https://perma.cc/27AH-Y9TE.

What is more, Defendants admit that Los Angeles County alone has now "processed more than 331,000 [vote-by-mail] ballots to date." CR 32-1 at 11. When Defendants process vote-by-mail ballots, they separate the ballot from the envelope, and there is then no way to identify the voter. *Id.* Once illegally cast ballots are counted and commingled with lawful votes, the resulting harm is impossible to remedy. And California is well-equipped to provide a remedy, because it has laws on its books that facilitate the very relief sought here. *See, e.g.*, Cal. Code Regs. tit. 2, § 20363 (detailing how to resolve challenged ballots via segregation).

This motion could not have been filed earlier. The United States filed its complaint on October 15, 2026. CR 1. That morning, the Federal Government announced that it was charging numerous noncitizens in California with violating 18 U.S.C. § 611. *See* CR 61-2 & n.4 (collecting press releases); *see also supra* p. 4. That same day, the United States moved for an *ex parte* application to exceed the word count limitations and for a temporary restraining order and order to show cause why a preliminary injunction should not issue. CR 22. It attached the preliminary injunction motion to its application. The case was originally assigned to Judge Holcomb, who entered a standing order on October 20. CR 34 and 44. The next day, the case was transferred to Judge Carter. CR 46. The United States re-filed its application for preliminary injunctive relief upon the district court granting leave to exceed the word limit, CR 53 and 62. The district court has set a hearing for October 27. CR 64. But because Defendants have already been and are presently counting potentially noncitizen ballots, the United States requested expedited ruling on the temporary restraining order by noon October 22. CR 67 at 3. As of the time of this filing, the district court has failed to rule on the motion and therefore

has constructively denied the Federal Government's motion. *See, e.g.*, *A.A.R.P. v. Trump*, 605 U.S. 91, 92 (2025).

**3. When and how counsel notified:**

On October 23, 2026 at 11:14 a.m., the undersigned counsel for the United States sent an e-mail to all attorneys listed above explaining that the United States would be imminently filing this motion, explaining the basis for the motion, and seeking their position on the motion. Counsel for the State of California and Shirley Weber oppose the motion. The United States will serve a copy of this motion on counsel for Defendants by email immediately after this motion is filed.

**4. Submissions to the district court:**

In addition to the filings described above, the United States filed an emergency application for injunction pending appeal on October 23, 2026, at 6:17 a.m. Pacific Time. CR 76. The United States requested an order by 12:00 p.m. Pacific Time on October 23, 2026. *Id.* at 2. As of the time of this filing, no order has issued, and because of the extreme urgency of this emergency that continues with each passing minute, the United States brings this motion.

**5. Decision requested by:**

Appellant requests a decision by October 24, 2026. "Every voter in a federal primary election . . . has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974).

Dated: October 23, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney

*/s/ Julie A. Hamill*

JULIE A. HAMILL
Assistant United States Attorney
J. ROBERT RENNER
Assistant United States Attorney

Attorneys for Plaintiff-Appellant
United States of America

## INTRODUCTION

The United States files this emergency motion under Circuit Rule 27-3 for an injunction pending appeal to segregate—not to cancel—ballots cast by ineligible noncitizen voters that are currently being tabulated in the ongoing Federal election, contrary to Federal criminal law. *See* 18 U.S.C. § 611. The Federal Government has identified over twenty thousand individuals who are "(1) registered to vote in California, (2) were sent a vote-by-mail ballot, and (3) are highly likely to be noncitizen aliens." CR 62-2 (Declaration of Nicolas Bartell ("Bartell Decl.") at para. 25; CR 62-3 (Declaration of Eric McLoughlin ("McLoughlin Decl.") at para. 25. But California refuses to act and opposes even the simple step of segregating ballots by these individuals—some of whom have now been criminally charged with violating 18 U.S.C. § 611, which prohibits noncitizen voting in federal elections. *See* Press Release, Department of Justice *28 Foreign Nationals Arrested on Charges that they Illegally Registered and Voted* (October 19, 2026), *available at* https://perma.cc/27AH-Y9TE.

What is more, Defendants (collectively, California) admit that Los Angeles County alone has now "processed more than 331,000 [vote-by-

mail] ballots to date." CR 32-1 at 11. When California processes vote-by-mail ballots, it separates the ballot from the envelope, and there is then no way to identify the voter. *Id.* Once illegally cast ballots are counted and commingled with lawful votes, the resulting harm is impossible to remedy. And California is well-equipped to provide a remedy, as it has laws on its books that facilitate the very relief sought here. *See, e.g.*, Cal. Code Regs. tit. 2, § 20363 (detailing how to resolve challenged ballots via segregation).

***

This is a case that must be resolved by November 3. "Every voter in a federal primary election . . . has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States,* 417 U.S. 211, 227 (1974). Yet every minute of processing that occurs without segregating the ballots of suspected ineligible voters causes untraceable disenfranchisement and dilution of the votes of United States citizens. Once an unlawful vote is processed, it cannot be undone. Accordingly, this Court should immediately issue an injunction pending appeal that orders California to set aside vote-by-mail ballots from likely noncitizens identified by the

Federal Government—including ballots cast by the individuals charged with 18 U.S.C. § 611 crimes this week—until the voter's citizenship status can be determined. The United States seeks this relief to prevent unlawful dilution of American citizens' votes and to protect the integrity of our elections. *See Anderson*, 417 U.S. at 227.

## STATEMENT

This case concerns the State of California's refusal to segregate the ballots of tens of thousands of individuals identified by the Federal Government as highly likely to be ineligible to vote.

**1.** The Federal Government includes several agencies and sub-agencies with authority to evaluate individuals' citizenship. The United States Citizenship and Immigration Services (USCIS) is responsible for adjudicating immigrant visa and naturalization applications. *See* 6 U.S.C. § 271. The Fraud Detection and National Security Directorate (FDNS) is an agency within USCIS that "safeguards the integrity of the nation's lawful immigration system by leading USCIS' efforts to combat fraud, detect national security and public safety threats, and maximize law enforcement and Intelligence Community partnerships." *FDNS Mission*, *available at* https://perma.cc/4SHH-GAQX. Its expertise and

mission encompass noncitizen fraud in federal elections. *See* CR 62-2 (Bartell Decl.) at para. 13. Homeland Security Investigations (HSI), which resides within Immigration and Customs Enforcement, serves as the primary investigative agency enforcing America's immigration laws and maintains records and information on individuals who are being investigated for violations of the United States' immigration laws or regulations. 6 U.S.C. § 252.

USCIS receives state voter rolls or information on state voter rolls to review for potential aliens who unlawfully registered to vote or who voted in a federal election. *See* CR 62-2 (Bartell Decl.) at para. 13. This data gathering process is distinct from the Systematic Alien Verification for Entitlements (SAVE) program. *Id.* at para. 15. When presented with information on voter rolls from agencies like DHS, USCIS processes that information to identify registered voters who are likely aliens. *Id.* at para. 14; *see also* CR 62-3 (McLoughlin Decl.) at para. 14.

USCIS begins its process by enhancing the voter data it receives through a reliable third-party data analytics and investigative platform. CR 62-2 (Bartell Decl.) at para. 14 . The raw voting record data are combined with the enhanced data and then paired with an internal

USCIS alien number to identify the same individual. *Id.* at para. 16. USCIS then scores and ranks the potential identity match to account for incomplete, outdated, or mismatched information. *Id.*

Following a preliminary identity match, USCIS screens potential matches against Department of State and Social Security Administration data to remove individuals who can be identified as United States citizens (or as deceased), and then it excludes those matches from further review. *Id.* at para. 17. Afterwards, USCIS consolidates all match evidence and assigns a confidence level for each match. *Id.* at para.18. A high confidence match means the match between the voting record and USCIS alien record is “strong and consistent with multifield evidence supporting a strong identity link.” *Id.* At that point, USCIS has completed its initial review.

Based on the results of that initial review, the FDNS investigators within USCIS *manually* review every match to confirm the identity match and determine which registered voters they believe are very likely to be aliens based on USCIS’ citizenship data. *Id.* at para.19. Part of that investigation includes verifying whether the registered voter could have potentially derived citizenship based on history or through parentage. *Id.*

Investigators also confirm the match with Department of State systems to identify if any documents (*e.g.*, passports) might not have been linked to USCIS systems, but which bear on the individual's citizenship status. *Id.* A second-level review of the match and citizenship status determination occurs after all of that process, as an additional safeguard. *Id.* After completion of the multilevel and additional-safeguard review, USCIS makes a final determination on which matches to send to HSI for further assessment. *Id.* at para. 20.

Once USCIS and FDNS complete their analysis and send their work product, HSI performs an initial intake, which includes a quality review that identifies duplicate entries, incomplete records, missing identifiers, data quality issues, and the like. *See* CR 62-3 (McLoughlin Decl.) at para. 16. After that intake, HSI prioritizes the records for review and prepares the data for additional enrichment using approved analytic capabilities. *Id.*

HSI's enrichment process focuses on improving the completeness and consistency of identification information and, where lawfully permitted, identifying additional unique identifiers that may assist in reliable matching of the voters to their immigration status. *Id.* at para.17.

HSI's enrichment process can perform data matching across multiple authorized data sources and consolidate disparate records into a unified set of matching results. *Id.* The purpose of enrichment is to reduce the risk that voters are mistakenly associated with the wrong immigration status. *Id.* That process adds value by applying consistent quality controls and enrichment processes before voter records are disseminated as investigative referrals or routed for another authorized purpose. *Id.* at para.18. Then, after its investigation, HSI may ask USCIS to perform additional manual review of the relevant matches. *Id.* Once the HSI review is completed, each individual data profile is referred to the applicable HSI field office where it will be investigated for potential criminal violations. *Id.* at para.19.

California's voter roster containing voter registration information is available for purchase. *See* Cal. Elec. Code § 2188. HSI "received what appeared to be the California voter roster for the general election of 2026." CR 62-3 (McLoughlin Decl.) at para. 20; *see also id.* at para. 21. After assessing the credibility of the voter rolls, *id.* at para. 20, HSI forwarded it to USCIS and FDNS on or around May 8, 2026, *see* CR 62-2 (Bartell Decl.) at para. 21. FDNS took that list and analyzed the data

through the above-described process. *Id.* at para. 22. That produced a "refined list of individuals who the [FDNS] believes are highly likely to be noncitizen aliens registered to vote in the 2026 federal election in California." *Id.* FDNS then sent that refined list to HSI. *Id.*

Once HSI received the list from FDNS, HSI further refined the data through the above-described HSI process and through federal law enforcement systems. CR 62-3 (McLoughlin Decl.) at para. 23. "That further refinement resulted in over 20,000 individuals remaining on the list." *Id.* HSI then facilitated the delivery of that final list to the Department of Justice, the U.S. Attorney's Office for the Central District of California, and the Los Angeles County Registrar-Recorder / County Clerk (RR/CC) on October 13, 2026. *Id.* at para. 24. The Department of Justice made the same list available to the California Secretary of State on the same day. *Id.*; *see also* CR 1 (Compl.), Exs. C & D (delivering list to California).

The list of over 20,000 individuals delivered to California represents the floor of potential noncitizen California voters. *See* CR 62-2 (Bartell Decl.) at para. 23. USCIS, FDNS, and HSI continue to analyze additional potential noncitizen voter records through the above-

mentioned multilevel review process. *Id.* For example, "USCIS has identified a separate batch of more than 17,000 voting records potentially tied to noncitizens after an initial review of voter rolls." *Id.* And based on USCIS' experience in this process, "most voters in [an] initially flagged population will end up being referred to HSI." *Id.* The review is ongoing as additional records are received on a rolling basis before the election date to ensure election integrity. *Id.* USCIS will supplement the record with additional information of likely noncitizen voting in the federal election. *Id.*

**2.** In July 2026, U.S. Secretary of Homeland Security Mullin wrote to California Secretary of State Weber alerting her that a "[p]reliminary review" of California records revealed that there may be as many as 190,832 noncitizens registered to vote in California. CR 1 (Compl.), Ex. A. "As an example," he stated, the Department of Homeland Security (DHS) "found 81,336 California registrants for whom the name, date of birth, address and Social Security number match a non-citizen in [DHS] files." *Id.* He then requested collaboration with California "to ensure the accuracy of [the] findings." *Id.*

Notwithstanding that California has registered numerous noncitizens to vote before, Secretary Weber responded a week later to cast doubts about noncitizen voting in the State. *See* Mark Osborne, *1,500 noncitizens may have been registered to vote in California DMV error*, ABC News (Oct. 9, 2018), *available at* https://perma.cc/9RM4-THZX (California "admitted . . . a mistake caused as many as 1,500 noncitizens being registered to vote in the state" and had earlier identified some "23,000 Californians" who had their voter registration mishandled). Her response letter did not refute that noncitizens are registered to vote. Nor did she contest that they would receive vote-by-mail ballots if they registered to vote. Instead, she cast "serious doubts" about noncitizens registered to vote in California because the State had refused to share its "statewide voter registration list with DHS or any other federal agency or official." CR 1, (Compl.), Ex. B. She nonetheless asked for additional details to evaluate the claims.

Federal Government provided those details last over one week ago. On October 13, the Federal Government hand delivered a list of over 20,000 individuals to RR/CC who it reasonably believes are noncitizens registered to participate in the federal election. *See* CR 62-3 (McLoughlin

Decl.) at paras. ¶¶ 23-24 and Ex. A; *accord* CR 62-3 (Bartell Dec.) at paras. ¶¶ 24-25; CR 1, (Compl.) at para. ¶ 47. Federal Government requested that California review the list within 48 hours to determine whether citizens are listed. CR 1-4, (Compl.), Ex. D at 1. "For individuals whom [California] cannot independently confirm citizenship status," the Federal Government requested that California "instruct the appropriate elections official to segregate—not cancel—those individuals' vote-by-mail ballots until their citizenship status can be determined." *Id.* "This process," the Federal Government emphasized, "will protect American citizens' votes while preventing noncitizens from participating in the federal election in violation of federal law." *Id.* at 2. The Federal Government asked for a response to its modest request.

California responded two days later rejecting cooperation with the Federal Government and made clear it would not do anything to prevent noncitizen voting. *See* CR 1-1, CR 1-2, (Compl. Exs. A & B). California's responses also acknowledged receipt of the list of over 20,000 individuals. *Id.* The RR/CC claimed that it was legally prohibited from preventing noncitizen voting—or even collaborating with the Federal Government on this issue—because "federal and state law support and require voter

registration when eligibility requirements are met by attestation from an applicant." Ex. CR 1-1 (Compl.), Ex. A at 2. The RR/CC did not explain why these laws would apply in the face of credible evidence demonstrating that the applicant is a noncitizen. *Id.* Next, the RR/CC stated that it could not remove ineligible voters from its voter rolls, but the Federal Government never requested that voters be removed from voter rolls. *Id.* at 3. Third, the RR/CC said that it could not "refuse to permit any person to vote who is entitled to vote." *Id.* (citing 52 U.S.C. § 10307(a)). Yet it did not explain why it believes the likely noncitizens identified by the Federal Government would be entitled to vote in violation of 18 U.S.C. § 611. Finally, the RR/CC complained about "practical problems" due to its workload if it had to prevent noncitizen voting. *Id.* "Based on the foregoing," the RR/CC stated, it would not "comply with" the request to help prevent noncitizen voting. *Id.* at 4. The California Secretary of State iterated the same points. *See* CR 1-2 (Compl.), Ex. B.

Because California refused to even try to prevent noncitizen voting in violation of 18 U.S.C. § 611, despite being provided with a list of likely noncitizen voters by the Federal Government, the United States seeks

narrow injunctive relief consistent with ordinary practices when a ballot is called into question. This Court should immediately enjoin California from tabulating vote-by-mail ballots from likely noncitizens in the federal election until the voter's citizenship status can be determined. To do so, this Court should order California (1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote.

**3.** The United States filed its complaint on October 15, 2026. CR 1. That morning, the Federal Government announced that it was charging numerous noncitizens in California with violating 18 U.S.C. § 611. *See* CR 61-2 & n.4 (collecting press releases); *see also supra* p.4. That same day, the United States moved for an ex parte application to exceed the word count limitations and for a temporary restraining order and order to show cause why a preliminary injunction should not issue. CR 22. It attached the motion for temporary restraining order and order to show cause to its application. The case was originally assigned to Judge Holcomb, who entered a standing order on October 20. CR 34 and 44. The

next day, the case was transferred to Judge Carter. CR 46. The United States re-filed its application for preliminary injunctive relief upon the district court granting leave to exceed the word limit, CR 53 and 62. The district court has set a hearing for October 27. CR 64. Because Defendants have already been and are presently counting potentially noncitizen ballots, the United States requested expedited ruling on the temporary restraining order by noon October 22. CR 67 at 3. As of the time of this filing, the district court has failed to rule on the motion and therefore has constructively denied the Federal Government's motion. *See, e.g.*, *A.A.R.P. v. Trump*, 605 U.S. 91, 92 (2025).

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction." *Feldman v. Arizona Sec'y of*

*State's Off.*, 843 F.3d 366, 367 (9th Cir. 2016). All of those factors support the United States and warrant injunctive relief here.

## ARGUMENT

### A. The Federal Government is likely to prevail on the merits of its as-applied challenge.

**1.** Under the Supremacy Clause, the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land[.]" U.S. Const. art. VI, cl. 2; *Arizona v. United States*, 567 U.S. 387, 399 (2012) ("The Supremacy Clause provides a clear rule that federal law" is supreme over state law). Federal preemption principles ensure the constitutional supremacy of federal law. Under those principles, contrary "state law must yield to the regulation of Congress within the sphere of its delegated power." *Savage v. Jones*, 225 U.S. 501, 533 (1912). And federal law can preempt state law "[e]ven without an express provision for preemption." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). That includes where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at 373 (citations omitted) (cleaned up), or otherwise "directly conflict[s]" with federal law, *Kansas v. Garcia*, 140 S. Ct. 791, 808 (2020) (Thomas, J., concurring).

State action must "give way" when it conflicts with "a considered judgment" embodied in federal law. *Arizona*, 567 U.S. at 399, 405.[1]

States cannot avoid preemption by facilitating a private party to violate federal law. "It is . . . axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). For example, if a state purported to subsidize federal crimes, that would conflict with the considered judgment of Congress. *See, e.g.*, *Musta v. Mendota Heights Dental Ctr.*, 965 N.W.2d 312, 321-27 & n.11 (Minn. 2021) (federal law preempted a requirement that an employer subsidize the purchase of a federally prohibited drug), *cert denied*, 142 S. Ct. 2834 (Mem.) (2022).

When evaluating the obstacle that state action poses to federal aims, courts "examin[e] the federal statute as a whole and identify[] its purpose and intended effects[.]" *Crosby*, 530 U.S. at 373. To illustrate, when a State "authorizes [persons] to engage in conduct that the federal

---

[1] The United States has standing and may seek equitable relief for reasons explained to the district court. *See* CR 22-2 at 15–17 (citing *Arizona v. United States*, 567 U.S. 387 (2012); *In re Debs*, 158 U.S. 564, 584, 599 (1895); *United States v. Missouri*, 114 F.4th 980 (8th Cir. 2024).

[law] forbids, it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Mich. Canners and Freezers Ass'n, Inc. v. Agricultural Marketing and Bargaining Bd.*, 467 U.S. 461, 478 (1984) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). At bottom, obstacle preemption exists wherever a state "undermines the intended purpose and natural effect" of a federal statute. *Crosby*, 530 U.S. at 373 (internal quotation marks omitted).

These preemption principles apply when state officials act in a manner that obstructs or conflicts with federal law. "It has long been a settled principle that federal courts may enjoin unconstitutional *action* by state officials." *Puerto Rico v. Branstad*, 483 U.S. 219, 228 (1987) (emphasis added) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Accordingly, whether state and local officials "act[] through . . . procedures rather than a court order or a general law . . . is irrelevant to [the] analysis." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614 n.5 (1986). Preemption does not turn on the form of state action. It "turns on the actual content of [a state's] policy and its real effect on federal rights." *Livadas v. Bradshaw*, 512 U.S. 107, 119 (1994) (citing and adopting *Livadas v. Aubry*, 987 F.2d 552, 561 (9th Cir. 1991) (Kozinski,

J., dissenting) ("The point is, the Commissioner is applying state law and his own policy in a way that impinges on protected federal rights.")).

Courts have thus held that federal law preempts a wide range of conflicting state actions. Where state officials operating a state university had a "policy" of "preferential treatment" regarding "in-state status" that the Supreme Court deemed inconsistent with federal immigration law, that "policy" itself "violate[d] the Supremacy Clause." *Moreno*, 458 U.S. at 17. Preemption likewise applied when state officials acted to "encourag[e] racial segregation" in violation of the Equal Protection Clause. *United States v. City of Jackson*, 318 F.2d 1, 3–4 (5th Cir. 1963). Or when California itself sought to pursue civil litigation in state court to set emissions standards in violation of the Clean Air Act. *See Daimler Truck N. Am. LLC v. California Air Res. Bd.*, 2025 WL 3049944, at *17–*18 (E.D. Cal. Oct. 31, 2025). A "conflict in technique can be fully as disruptive to the system Congress enacted as [a] conflict in overt policy" written in a statute or regulation. *Arizona*, 567 U.S. at 406. After all, *Ex parte Young*, through which litigants there sought to enjoin unconstitutional state *action*, does not focus on the validity of state law; it focuses on whether "a state official who enforces that law 'comes

into conflict with the superior authority of [the] Constitution.'" *Virginia Off. for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (quoting *Ex parte Young*, 209 U.S. at 159-60). That is the case here.

**a.** Federal law makes it "unlawful for any alien to vote" in federal elections. 18 U.S.C. § 611(a). Accordingly, California cannot "induce, encourage or promote"—let alone knowingly facilitate—noncitizen voting for a candidate who is running for a seat in the U.S. Senate or the U.S. House of Representatives when state election officials have notice of specific individuals who are likely to be noncitizens. *Norwood*, 413 U.S. at 465; *cf. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (applying *Norwood*'s "induce, encourage or promote" principle to scenario where a local government "had essentially become a '*passive participant*' in a system of racial exclusion" (emphasis added)); *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 475 (2013) (explaining that state actions "that require a private party to violate federal law are pre-empted").

Yet that is precisely what California is doing. Its actions therefore directly conflict with Federal law. The Federal Government notified California months ago that many noncitizens may be registered to vote there. Despite knowing that California must send vote-by-mail ballots to

every registered voter, Cal. Elec. Code § 3000.5, the State made no serious attempt to cooperate with the Federal Government or to otherwise determine whether noncitizens are registered to vote. *See* CR 1-2 (Compl.), Ex. B. Such prior efforts stand in sharp contrast to California's efforts since the start of this litigation that show it can cooperate with the Federal Government to prevent unlawful voting. *See* CR 32-1 at 17 (conducting analysis of likely noncitizen voters).

The Federal Government then provided California with a list of over 20,000 specific individuals who USCIS and HSI believe are likely noncitizens. *See* CR 1 (Compl.) at para. 47; *id.* Exs. C & D; CR 62-3 (McLoughlin Decl.) at para. 24 and Ex. A; CR 62-2 (Bartell Decl.) at paras. 24–25. Yet despite knowing that California must count any vote-by-mail ballot that satisfies California's (largely illusory) signature verification requirements, the State refused to verify the citizenship of people included on the list—or take any action whatsoever to do so before tabulating those persons' votes. *See* CR 62-5, Exs. A & B. California officials now know that over 20,000 California residents are highly likely to be noncitizens registered to vote. CR 62-2 (Bartell Decl.) at para. 25; CR 62-3 (McLoughlin Decl.), at para. 25. The officials even have

immediate access to the names of those potential voters. But California is now poised to tabulate the votes of persons who they are aware have been identified as likely noncitizens. More than that, California apparently intends to tabulate vote-by-mail ballots received by noncitizens who the United States has charged with having already violated federal election and immigration laws.

Federal law preempts California's actions here. By facilitating violations of the statute, California's actions conflict with the "considered judgment" the statute expresses. *Arizona*, 567 U.S. at 399, 405. If California were just seeking to "induce, encourage or promote" violations of the statute, that would be enough to trigger federal preemption. *Norwood*, 413 U.S. at 465. But California is not just supporting conduct that Federal law prohibits (such as when a state purports to subsidize illegal activity); it is directly facilitating violations of that Federal law by knowingly ignoring likely noncitizen votes. It "is simply implausible that Congress would have" criminalized voting by noncitizens "if it had been willing to" let States "compromise [the] effectiveness" of that law by participating in its violation. *Crosby*, 530 U.S. at 376. And California's systematic defiance of Federal law is all the more egregious because it

undermines the Federal rights of United States citizens to vote in an election in which only eligible voters participate. "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).[2]

**b.** California's actions also frustrate the objectives and purposes of 18 U.S.C. § 611(a). Congress's objectives and purposes are clear: only citizens vote in federal elections. Yet California is knowingly facilitating voting by likely noncitizens, and it is set to tabulate their votes without even attempting to verify their citizenship status when faced with credible evidence. If merely "authoriz[ing]" conduct that federal law prohibits can undermine "the full purposes and objectives of Congress[,]" *Michigan Canners*, 467 U.S. at 478, it follows that knowingly facilitating such conduct triggers obstacle preemption.

---

[2] The United States is not seeking to enjoin "election rules on the eve of an election." *Allen v. Milligan*, 608 U.S. 511, 514 (2026). Far from it, the United States is seeking relief to force California to *conform* to federal and state election rules concerning noncitizen voting. *See* 18 U.S.C. § 611. Such relief would not cause confusion among voters or otherwise, because it concerns how to handle certain ballots once cast. And California has the laws and systems in place to accommodate the requested relief. *See, e.g.*, Cal. Code Regs. tit. 2, § 20363 (detailing how to resolve challenged ballots via segregation).

California's actions pose an obstacle to the United States' ability to implement Congress's purposes and objectives by enforcing 18 U.S.C. § 611(a). The President has made clear that investigating and prosecuting violations of the statute are a major priority—including by expressly directing the Attorney General to "take all lawful steps to deter and address noncompliance with . . . 18 U.S.C. 611(a)." Exec. Order, *Ensuring Citizenship Verification and Integrity in Federal Elections* § 5 (Mar. 31, 2026). The Department of Justice has, in turn, charged numerous noncitizens accused of violating the statute—including charging numerous California residents the same day the United States filed their complaint. *See, e.g.*, Press Release, *Justice Department Announces Charges Involving 16 Aliens for Illegal Voting* (Oct. 16, 2026), https://www.justice.gov/opa/pr/justice-department-announces-charges-in-volving-16-aliens-illegal-voting; Press Release, *Department of Justice Indicts Ten Aliens for Voter Fraud in Minnesota* (Sept. 30, 2026), https://www.justice.gov/opa/pr/department-justice-indicts-ten-aliens-voter-fraud-minnesota; Press Release, *Justice Department Announces Charges Involving 16 Aliens for Election Crimes* (Oct. 12, 2026), https://www.justice.gov/opa/pr/justice-department-announces-charges-

involving-16-individuals-election-crimes; Press Release, *Justice Department Charges 28 Foreign Nationals in California for Election Crimes* (Oct. 19, 2026), https://www.justice.gov/opa/pr/justice-department-charges-28-foreign-nationals-california-election-crimes.

By facilitating *tens of thousands* of votes from likely noncitizens, California is obstructing the United States' law enforcement efforts. It is not practicable or feasible for the Federal Government to prosecute thousands, let alone tens of thousands, of individuals that two federal investigative offices have identified as likely noncitizens. And while a State is not required to help the Federal Government investigate and prosecute crimes, facilitating the commission of such crimes obviously hampers such efforts. Indeed, the scale of the problem arising from California's facilitation of unlawful voting threatens to draw federal resources from, and thus impede federal efforts in, a wide range of law enforcement areas, *e.g.*, violent crime. Such a drain of resources presents yet another obstacle to the United States' law enforcement efforts.

Accordingly, California's facilitation of unlawful voting by sending vote-by-mail ballots to likely noncitizens and counting ballots that are returned—despite knowing that these noncitizens are likely registered to

vote—is preempted as applied to the individuals the Federal Government has identified for California.

### B. The other injunction factors strongly favor the government.

The United States is likely to succeed on the merits and suffer irreparable harm. Critically, the public interest and balance of the equities overwhelmingly support an injunction requiring Defendants to segregate ballots of individuals known to the Federal Government and Defendants to be highly likely ineligible to vote. Such an extraordinary remedy is necessary to preserve the status quo, protect the integrity of our elections, and prevent potentially tens of thousands of violations of Federal criminal law.

Irreparable harm necessarily results from the enforcement of a preempted state law. *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 366–67 (1989) (irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause" (citation omitted)); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (irreparable harm based on Supremacy Clause violation); *Baird v. Bonta*, 81 F.4th 1036,

1040 (9th Cir. 2023) ("It is well-established that the first factor is especially important when a plaintiff alleges a constitutional violation and injury. If a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation."). This follows from the simple fact that the United States suffers a "per se irreparable harm" when state actions violate the Supremacy Clause. *United States v. Texas*, 557 F.Supp.3d 810, 821 (W.D. Tex. 2021) (collecting cases); *Daimler*, 2025 WL 3049944, at *17 (same). Indeed, the Supreme Court has repeatedly recognized that the "inability to enforce its duly enacted [law] clearly inflicts irreparable harm on" the United States. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (same).

The harm here is also quintessentially irreparable because California's mishandling of ballots cannot be undone. Under California law, election officials open ballots—and then separate for all time—the ballot from the envelope. Once this occurs, it cannot be undone. There is no further way for officials to track or trace ballots cast by individuals later determined to be ineligible to vote. Nor is there any way for Federal

law enforcement to trace these as part of criminal investigations. As we write, California election officials are tabulating votes. The only way to preserve the rapidly eroding status quo is for an injunction pending appeal to require California to segregate the ballots Federal officials have identified as associated with ineligible voters. Otherwise, what is done can never be undone.

The balance of equities and the public interest likewise favor the United States. Because the challenged laws are invalid under the Supremacy Clause, they are not in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1060 (9th Cir. 2009) (public interest represented by "the Constitution's declaration that federal law is to be supreme"). Indeed, it is emphatically contrary to the public interest to allow ineligible voters to have their votes cast and tabulated in a Federal election. This dilutes the votes of lawful voters. It directly affects which individuals will serve in Federal offices. It also facilitates violation of criminal law. 18 U.S.C. § 611. In particular, the failure to at least segregate ballots of the identified individuals forever impairs the ability of election officials to understand the effect of their votes on the election. It also significantly inhibits Federal law

enforcement investigations into whether the identified individuals did in fact violate Federal law by voting in a Federal election. Any comparable burden on Defendants associated with segregating ballots is de minimis in comparison. Segregating ballots is a targeted and narrow remedy, and is something Defendants already do with provisional ballots. The public interest and balance of the equities strongly support enjoining Defendants to segregate ballots of individuals identified as ineligible to vote.

## CONCLUSION

For the foregoing reasons, this Court should grant an immediate injunction pending appeal that requires California (1) to set aside vote-by-mail ballots from persons identified by the Federal Government likely to be noncitizens and (2) to independently—or in collaboration with the Federal Government—verify their citizenship status before tabulating their vote-by-mail ballot. The United States seeks this relief to prevent unlawful dilution of American citizens' votes and to protect the integrity of our elections.

Dated: October 23, 2026 Respectfully submitted,

TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney

*/s/ Julie A. Hamill*

JULIE A. HAMILL
Assistant United States Attorney
J. ROBERT RENNER
Assistant United States Attorney

Attorneys for Plaintiff-Appellant
United States of America

October 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5427 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook font.

*/s/ Julie A. Hamill*
JULIE A. HAMILL