No. 26-7070

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

STATE OF CALIFORNIA, *et al*.,

*Defendants-Appellees*.

**On Appeal from the United States District Court**
**for the Central District of California**
No. 2:26-cv-12025-DOC-ADS
The Honorable David O. Carter, Judge

# STATE DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
SAMUEL P. SIEGEL
*Supervising Deputy Solicitor General*

SETH E. GOLDSTEIN
*Supervising Deputy Attorney General*
ANNE P. BELLOWS
MICHAEL S. COHEN
LISA C. EHRLICH
ANDREW E. KUSHNER
CHRISTINA M. MCCALL
*Deputy Attorneys General*
MARIAH E. MASTRODIMOS
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
300 S. Spring Street
Los Angeles, CA 90013
(213) 269-6693
Samuel.Siegel@doj.ca.gov
*Attorneys for State Defendants*

October 24, 2026

## TABLE OF CONTENTS

**Page**

Introduction ........................................................................................ 1
Statement............................................................................................. 3
Argument............................................................................................. 7
I. This Court lacks jurisdiction ....................................................... 7
II. Plaintiff is unlikely to succeed on the merits ............................ 8
A. Plaintiff lacks standing and a cause of action ................. 8
B. 18 U.S.C. § 611's criminal prohibition does not preempt California's election laws ............................... 12
III. Equitable considerations decisively weigh against an injunction......................................................................... 18
Conclusion ......................................................................................... 24

## INTRODUCTION

Plaintiff asks this Court to interfere with state and local elections procedures when an election has "already started." *People Not Politicians v. Onder*, 609 U.S. ___, 2026 WL 2883222, *2 (Sept. 25, 2026). Mail ballots have been cast and processed in California since October 5, and Election Day is just one week from Tuesday. With no noted dissents, the Supreme Court recently—and repeatedly—stayed orders arising from the Eighth Circuit that interfered with an ongoing election. *E.g.*, *id.* This Court should not go down that path. The basis for plaintiff's request is as unprecedented as it is meritless. It identifies no source of appellate jurisdiction in the absence of any order from the district court; no injury for purposes of standing; no recognized cause of action; no theory on the merits resembling anything previously endorsed by the judiciary; no irreparable harm for purposes of injunctive relief; and no exception to the settled rule that lower federal courts should not alter the rules of approaching—or ongoing—elections. *Purcell v. Gonzalez*, 549 U.S. 1, 4-6 (2006).

On the merits, plaintiff's theory is that California officials' actions to administer state elections laws are "preempted" because those officials are purportedly "obstructing" investigation of a federal criminal statute barring noncitizens from voting. But California has long had laws in place to forbid noncitizen registration and voting, remove noncitizens from the rolls, verify

signatures, tabulate ballots, and adjudicate challenges to the validity of ballots through legally specified procedures. Plaintiff does not suggest California is failing to adhere to those laws or that the state laws violate federal laws. It instead argues that California is "facilitating" violations of federal law by refusing to *deviate from* longstanding state elections laws. Mot. 24.

That theory makes no sense, factually or legally. On the facts, plaintiff ignores the State's many laws to enforce voter-eligibility rules. It also glosses over its own slipshod, unreliable process. Plaintiff alleged last July that California "may" have some 190,000 noncitizens on its voter rolls. When state officials requested more information in writing, plaintiff did not respond. California did not hear anything further until October 13—just three weeks before Election Day—when plaintiff sent California a letter alleging that it "believes" 20,000 voters in L.A. County are "likely" noncitizens. California is understandably skeptical given plaintiff's refusal to share critical details about the investigation that produced these allegations, as well as the federal government's utter failure to substantiate similar allegations recently made in other States, such as Nevada.

Beyond these factual flaws with plaintiff's preemption theory, the theory would also turn the Constitution on its head. When it comes to rules of elections administration, the federal government has no power to interfere with the States unless Congress passes a law governing the time, place, or manner of elections.

The only statute identified by the application here—18 U.S.C. § 611(a)—restricts who may vote, but it does not specify how States should go about regulating voter eligibility. And it says nothing about the time, place, or manner of federal elections. To the extent plaintiff's theory is that California is not doing precisely what the federal administration desires to assist in enforcing federal laws, that theory is contrary to the Tenth Amendment and foreclosed by precedent. "[R]efusing to help is not the same as impeding," and provides no basis for preemption. *United States v. California*, 921 F.3d 865, 888 (9th Cir. 2019).[1]

## STATEMENT

1. The Constitution charges States with primary responsibility for administering federal elections. U.S. Const. art. I, § 4, cl. 1; art. II, § 1, cl. 2. Unless Congress provides otherwise, States have the authority "to provide a complete code for [federal] elections." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). States also have sole authority to set voter qualifications, or "*who* may vote." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 16 (2013) (*ITCA*).

This case involves one such qualification: California's requirement that only citizens may vote. *See* Cal. Const. art. II, § 2(a); Cal. Elec. Code §§ 2100, 2101.

---

[1] If the Court disagrees, and decides to issue an injunction, it would be imperative for the Court to preserve the status quo by issuing an administrative stay, *see Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019), to allow time for the State to seek emergency en banc review.

California enforces that requirement in several ways, including by requiring attestations of citizenship under penalty of perjury to register and by criminalizing voting by noncitizens. *Infra* pp. 12-13. California law also "sets forth a comprehensive statutory framework for the care and handling of ballots." *Cervantes v. Bianco*, 596 P.3d 602, 608 (Cal. 2026). Among other things, California requires elections officials to mail registered voters a ballot at least 29 days before an election. Cal. Elec. Code §§ 3001, 4005(a)(8)(A). After filling out the ballot, a voter places it in an envelope, signs it, and returns it. *Id.* §§ 3010(a)(2), 3011(a)(1)-(2).

Once a vote-by-mail ballot is received, the Registrar verifies the signature, and, if the signature is valid, separates the ballot from the identification envelope and tabulates the vote. Cal. Elec. Code §§ 3019(a)(1), 3019(b), 15101, 15109. Because California law also protects ballot secrecy, *see* Cal. Const., art. 2, § 7, once a signature is verified and a ballot is separated from its envelope, it is not possible to identify who cast it, Dkt. 32-4 at 8. The only circumstance in which the Registrar may not tabulate a vote (once the signature is verified) is if certain specified individuals contest a voter's eligibility at the place the mail ballot is processed. That process is governed by a carefully reticulated set of state and local laws. *See* Cal. Elec. Code §§ 14240, 15104, 15105; Cal. Code Regs. tit. 2, § 20879. Any person who challenges a mail voter's qualifications has the "burden

of establishing extraordinary proof" that the voter is ineligible to vote "at the time the challenge is made." Cal. Elec. Code § 15106; Cal. Code Regs. tit. 2, § 20879.

Federal law also touches upon several aspects of voting. The National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act (HAVA) mandate that state voter-registration forms include certain information. 52 U.S.C. §§ 20508(b)(2), 21083(b)(4)(A)(i). The NVRA also requires States to make "reasonable effort[s] to remove" specified ineligible voters from its voter rolls. *Id.* § 20507(a)(4). While States set voter-eligibility requirements, federal law makes it a misdemeanor for noncitizens to "vote in any election held solely or in part for the purpose of electing" federal officials, with certain exceptions. 18 U.S.C. § 611(a). No federal statute prescribes the manner in which States must process ballots once received.

2. On July 16, 2026, the Department of Homeland Security (DHS) sent a letter to California Secretary of State Weber, claiming that there "may be as many as 190,832 non-citizens registered to vote in California." Dkt. 1-1 at 2. Secretary Weber promptly responded, expressing concern about the accuracy of DHS's claims and requesting additional information. Dkt. 1-2 at 2. DHS did not provide the requested information.

As required by California law, by October 5, 2026, the Los Angeles County Registrar-Recorder/County Clerk had sent mail ballots to approximately 5.9

million registered voters. Dkt. 32-4 at 8-9, 13. By October 20, 331,000 ballots had been returned and processed consistent with state procedures. *Id.* at 10.

On October 13, the U.S. Department of Justice sent the Registrar a thumb drive with a statewide "list of names of people the Federal Government believes are likely noncitizens who were sent a vote-by-mail ballot," and it asked him to "segregate" those persons' ballots "until their citizenship status can be determined." Dkt. 1-4 at 1. It sent a similar letter to Secretary Weber. Dkt. 1-3. The letters demanded that the Secretary and the Registrar "review the list within 48 hours" to verify each person's citizenship. *Id.* at 2; Dkt. 1-4 at 2. They did not specify how they compiled the list or provide evidence of noncitizenship. In response, Secretary Weber and the Registrar raised concerns about the reliability of the federal government's data and stated they would continue to administer the election consistent with federal and state law. Dkts. 31-2, 32-2.

Less than 48 hours later, the United States filed this lawsuit against California, Secretary Weber, and the Registrar, asserting one claim for relief: that defendants' refusal "to independently verify the citizenship of people" specified on the list "violat[es] the Supremacy Clause" and section 611. Dkt. 1 at 12-13. It asserted that the list had "over 20,000" names on it. *Id.* at 2. It sought an order enjoining defendants from "tabulating in federal elections vote-by-mail ballots

received from individuals identified by the Federal Government" until their "citizenship status can be verified." *Id.* at 14.

On October 19, plaintiff filed an application for a temporary restraining order (TRO), asking for relief by November 3. Dkt. 22-2. The district court set a hearing for this coming Tuesday, but before the district court ruled, plaintiff filed its notice of appeal. Dkt. 74.

## ARGUMENT

For an injunction pending appeal, plaintiff must show that it is likely to succeed on the merits, it will be irreparably harmed, the balance of equities tips in its favor, and an injunction would be in the public interest. *Brown as next friend of K.M.K. v. Wash. Interscholastic Activities Ass'n*, 2026 WL 2891827, *1 (9th Cir. Sept. 25, 2026). Where, as here, a plaintiff seeks a mandatory injunction, an injunction pending appeal will not be granted "unless extreme or very serious damage will result." *Id.*

### I. THIS COURT LACKS JURISDICTION

28 U.S.C. § 1292(a)(1) grants this Court jurisdiction over appeals from "orders" either "granting" or "refusing" injunctions. Because no "order" was entered here, this Court lacks appellate jurisdiction. *See* Fed. R. App. P. 4(a). A district court's denial of a temporary restraining order would ordinarily not be appealable, let alone a district court's failure to rule on a TRO request on plaintiff's

preferred schedule. *See, e.g.*, *Off. of Pers. Mgmt. v. Am. Fed'n of Gov't Emps.*, *AFL-CIO*, 473 U.S. 1301, 1303-1305 (1985) (Burger, C.J., in chambers).

Nor is this the rare case where the Court has "jurisdiction to review interlocutory orders that have the practical effect of refusing an injunction." *A.A.R.P v. Trump*, 605 U.S. 91, 94 (2025). "A district court's inaction in the face of extreme urgency and a high risk of 'serious, perhaps irreparable,' consequences may have the effect of refusing an injunction." *Id.* Plaintiff comes nowhere close to meeting that extraordinary bar. It asserts that urgent action is needed to prevent tabulation of votes under standard state election practices based on an unfounded claim that noncitizens have received vote-by-mail ballots and may return them. Mot. 10. That ignores the state rules governing tabulation of ballots, as well as existing state and federal safeguards against noncitizen voting, *supra* pp. 3-5, and rests on rank speculation, *infra* pp. 10-11, 21-23. And far from preventing irreparable harm, *compare A.A.R.P.*, 605 U.S. at 93, plaintiff's requested relief would cause extraordinary harm by altering the ordinary rules for tabulating ballots in the middle of an election, *see Purcell*, 549 U.S. at 4-6.

## II. PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS

### A. Plaintiff Lacks Standing and a Cause of Action

1. To obtain preliminary relief, a plaintiff "must make a clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir.

2013). Here, plaintiff cannot establish that California's elections laws cause it "injury in fact." *Id.* Plaintiff asserts that it suffers "per se" harm whenever it alleges that a federal law preempts state law. Mot. 34. But as several district courts have recently concluded, "the mere *existence* of an [allegedly] preempted state law" does not "create[] a sovereign injury to the federal government." *United States v. California*, 824 F. Supp. 3d 1079, 1083 (C.D. Cal. 2026); *accord United States v. Michigan*, No. 26-cv-00246, Dkt. 44 at 7 (W.D. Mich. Oct. 7, 2026). Members of the Supreme Court have also raised doubts about that expansive "sovereign" theory of standing. *See, e.g.*, Tr. of Oral Argument at 5:7-9:8, 29:22-30:4, 44:4-45:8, 45:14-46:7, *United States v. Texas*, 142 S. Ct. 416 (2021) (No. 21-588); *see also* Br. for Respondents at 34-38, *United States v. Texas*, 142 S. Ct. 416 (Mem.) (2021) (No. 21-588) ("[p]urported 'sovereign interests'" do not alone suffice to "give the United States standing").

In arguing otherwise below, plaintiff relied on several cases, none of which squarely addresses whether the federal government has standing to sue States based solely on the existence of an allegedly preempted state law. Dkt. 22-2 at 15-16. For example, in *Arizona v. United States*, 567 U.S. 387 (2012), the federal government "asserted concrete, particularized injuries resulting from Arizona's immigration laws," including that Arizona's laws would "impose significant and counterproductive burdens on federal agencies charged with enforcing the national

immigration scheme." *Michigan*, No. 26-cv-00246, Dkt. 44 at 9; *see also id.* at 9-11 & n.3 (distinguishing other authorities). The are no similar allegations here.

Below, plaintiff also asserted an injury in the form of "expend[ing] resources" in the enforcement of federal law. Dkt. 22-2 at 16-17. But it cited no authority for the proposition that spending money to enforce a criminal prohibition provides standing to challenge state policies.[2] Such a theory lacks a limiting principle; it would allow the federal government to "initiate a campaign of preemption suits under the aegis of its sovereignty to bring state law in line with its own political agenda." *California*, 824 F. Supp. 3d at 1085. Standing doctrine is intended to prevent exactly that sort of abuse; it "implements the Framers' concept of the proper—and properly limited—role of the courts in a democratic society." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

Plaintiff further argues that it is harmed because, by sending out ballots to persons they "know[] are likely to be noncitizens," defendants "dilute[] lawful voting and unduly influence[] who runs the Federal Government." Dkt. 22-2 at 16. But its allegations that noncitizens have been mailed vote-by-mail ballots are dubious. *See infra* pp. 21-23. And the only way that voting by noncitizens could

[2] *United States v. Missouri*, 114 F.4th 980 (8th Cir. 2024) is inapposite. There, Missouri withdrew support it had previously provided to help the federal government enforce its laws. *Id.* at 985.

"unduly influence who runs the federal government" is if sufficient noncitizens cast ballots to affect the result of an election. Such highly speculative "allegations of *possible* future injury" are not sufficient to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Plaintiff's standing theory rests on a "highly attenuated chain of possibilities," *id*. at 410: voters ignored state and federal laws that require them to attest to their citizenship to register; obtained a ballot; and cast a vote in this election. Plaintiff has not made the necessary clear showing at any step of this chain.

2. Plaintiff also lacks a cause of action. "[L]ike any other plaintiff, the federal government must first have a cause of action" to sue. *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980). Plaintiff has not identified one. Instead, in the court below it relied on an "equitable tradition of suits to enjoin unconstitutional state actions." Dkt. 22-2 at 17. But to invoke equity's aid, plaintiff must demonstrate that the remedy it seeks is one of "those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception." *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025). Nothing in our Nation's history or tradition supports plaintiff's request for a court order that would disrupt state election laws and dragoon state and local officials into identifying allegedly unlawful voters. *Infra* p. 16 (discussing the anticommandeering doctrine). And none of the authorities plaintiff relied on

below, *see* Dkt. 22-2 at 17, involved such an extraordinary request. To the contrary, those authorities either did not address this issue, *see, e.g.*, *Arizona*, 567 U.S. at 393, or establish only that it may sue in equity to protect interstate commerce, *see, e.g.*, *In re Debs*, 158 U.S. 564, 599 (1895); *see also United States v. Mattson*, 600 F.2d 1295, 1298-1299 (9th Cir. 1979) (federal government may sue in equity only to protect "a property interest, interference with national security or a burden on interstate commerce").

### B. 18 U.S.C. § 611's Criminal Prohibition Does Not Preempt California's Election Laws

1. The Elections Clause vests States "with responsibility for the mechanics of congressional elections." *ITCA*, 570 U.S. at 9. Although Congress has power to "pre-empt state legislative choices" as to "*how* federal elections are held," Congress may not regulate "*who* may vote in them." *Id.* at 9, 16. "Prescribing voting qualifications, therefore, 'forms no part of the power to be conferred upon the national government' by the Elections Clause, which is 'expressly restricted to the regulation of the *times,* the *places,* and the *manner* of elections.'" *Id.* at 12.

California has exercised its broad authority over elections by specifying who may vote in congressional elections and regulating the times, places, and manner of holding them. Under California law, only citizens may vote. *Supra* p. 3. California enforces that requirement by, for instance, requiring an attestation of citizenship under oath to register to vote; by matching signatures on mail ballots

and registration records; and by criminalizing fraudulent voting by ineligible voters. *E.g.*, Cal. Elec. Code §§ 2101, 2102(c), 2111, 2150(a)(1), 2264(a)(3), (b), 3019, 18560. Elections officials must also cancel the registration of any voter upon proof that the person is ineligible to vote. *Id.* §§ 2201(a)(8), (c), 2213. Under state law, specified individuals may challenge mail ballots based on the voter's qualifications to vote, including citizenship. *Supra* pp. 4-5. Once a ballot is cast, detailed provisions govern how state officials must handle a ballot, including by signature matching and counting a ballot. *Cervantes*, 596 P.3d at 608. Detailed provisions also specify the exclusive circumstances in which cast ballots may *not* be counted. *Supra* pp. 4-5.

Dissatisfied with California's manner of conducting elections and verifying citizenship of its voters, plaintiff asserts that section 611 preempts California's detailed process for qualifying voters and counting ballots. Mot. 27. But section 611 is a misdemeanor criminal statute that provides only that it "shall be unlawful for any alien to vote in any" federal election, except in certain circumstances. 18 U.S.C. § 611(a)(1)-(a)(3). It governs an individual's conduct and does not specify how a State must verify the qualifications of voters, what a State must do when presented with an allegation that a voter is unqualified, or how a State must handle voted ballots from allegedly unqualified voters. Nor does it authorize the federal government to superintend or interfere with a State's

administration of its elections. California's election regime thus does not conflict with any aspect of section 611—and "state law is preempted by the federal [election] statutes only 'so far as the conflict extends.'" *Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 697 (2026).

In fact, section 611's plain terms explicitly honor state laws concerning voter qualification requirements. The statute exempts from its scope noncitizens who are "authorized to vote" by state law under specified circumstances. 18 U.S.C. § 611(a)(1)-(a)(3). Thus, far from supporting a blanket override of a State's voter qualification determinations, the statute expressly incorporates state law in defining its scope. If the statute had the expansive preemptive scope suggested by plaintiff, it would plainly exceed Congress' limited power under the Elections Clause. *Supra* p. 12. Indeed, a federal court recently held that section 611 is unconstitutional because it interferes with States' "sole authority to set voter qualifications." *United States v. Cox*, 2026 WL 2948729, *10 (S.D. Fla. 2026); *see* Mem. of Court-Appointed Amicus Paul Clement, *United States v. Cox*, No. 25-CR-60249, Dkt. 46 (S.D. Fla. July 23, 2026) (arguing section 611 is unconstitutional).

2. Plaintiff does not seriously contend that California's system of election administration conflicts with the terms of section 611. Rather, it argues that California "knowingly facilitate[s]" violations of the statute by declining to adopt

the federal government's requested approach to voter-eligibility verification. Mot. 27. That is not a valid preemption argument, but an improper effort to impose new obligations on elections officials that Congress has never enacted. Earlier this year, Congress refused to enact voter-verification requirements "through the democratic process." *Watson*, 609 U.S. at 696; *see* S.B. 1383, 119th Cong., https://www.congress.gov/bill/119th-congress/senate-bill/1383 (the SAVE America Act). Plaintiff should not be allowed to circumvent that process and achieve through the courts—and an unfounded preemption theory—what could not be achieved through democratic means. In any event, plaintiff's factual premise is flatly wrong: California law prohibits voting by noncitizens; it does not "knowingly" encourage such voting in any way. *Supra* pp. 3-4.

Plaintiff's obstacle preemption theory (Mot. 30-33) also fails under settled precedent. "'The Supreme Court has found obstacle preemption in only a small number of cases' of two specific types: those where 'the federal legislation at issue involved a 'uniquely federal area[] of regulation' and state law 'directly interfered with the operation of the federal program,' and those where 'a federal enactment clearly struck a particular balance of interests that would be disturbed or impeded by state regulation.'" *ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 177 F.4th 964, 972 (9th Cir. 2026). Neither circumstance exists here: election administration is traditionally the province of States, *supra*

p. 12, and there is no credible argument that California's mechanism for verifying voter eligibility or tabulating votes "disturb[s]" or "impede[s]" section 611, which says nothing about how to verify eligibility or count votes.

On the contrary, California's election rules fully comply with Congress's mandates governing election administration. For example, the NVRA and HAVA require voter registration applicants to attest to voter eligibility under oath, including citizenship. 52 U.S.C. §§ 20508(b)(2), 21083(b)(4)(A)(i). California does, too. Cal. Elec. Code §§ 2101, 2102(c), 2111, 2150(a)(1), 2264(a)(3), (b). The NVRA also requires that States "conduct a general program that makes a reasonable effort to remove" specified ineligible voters. 52 U.S.C. § 20507(a)(4). California does this as well. *See* Cal Elec. Code §§ 2200 *et seq*. State law cannot impede federal law when it simply "trace[s]" it. *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 602 (2011).

At bottom, plaintiff's preemption theory amounts to the view that the Executive Branch may demand that States "work[] with the Federal Government to prevent" violations of federal criminal laws. Dkt. 1 at 14. But the federal government cannot "commandeer" States "to address particular problems," or "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 929, 935 (1997). As this Court has emphasized, "refusing to help is not

the same as impeding," and is no basis for an obstacle-preemption claim. *California*, 921 F.3d at 888.

3. Plaintiff is likely to fail on the merits for a host of other reasons. "As a general rule," courts "are reluctant to issue injunctions against the commission of a crime" in recognition of "the adequacy of the criminal remedy to protect the plaintiff's interests." 11A Wright & Miller's Fed. Prac. & Proc. § 2942 & n. 73 (3d ed. 2026). While plaintiff may seek an injunction against a potential crime when a specific statute authorizes such relief, *e.g.*, *Beck v. Prupis*, 529 U.S. 494, 496 n.1 (2000), Congress has not authorized it under section 611. And while Congress has expressly authorized USDOJ to seek injunctive relief to prevent alleged criminal violations of *other* election laws, *see* 52 U.S.C. §§ 10308(d), 20510(a), section 611 is not among them—an "omission[] [that] should be understood as exclusion[]," *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc).

Granting the requested relief would also violate multiple state and federal laws. At a minimum, it would violate California's laws governing its elections. *Supra* pp. 3-5, 12-13. It would also contravene: the NVRA's prohibition on any state "program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" in the 90 days leading up to an election, 52 U.S.C. § 20507(c)(2); the Voting Rights Act's command that

"[n]o person acting under color of law shall fail or refuse to permit any person to vote who is . . . qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote," *id.* § 10307(a); and the Constitution's protections of the right to vote, *see Burdick v. Takushi*, 504 U.S. 428, 434 (1992); Dkt. 31-1 at 19-23.

## III. EQUITABLE CONSIDERATIONS DECISIVELY WEIGH AGAINST AN INJUNCTION

1. Relief "may be inequitable if it is issued shortly before an election, when candidates, election officials, and voters have relied on the rules in place at that time." *Malliotakis v. Williams*, 146 S. Ct. 809, 811 (2026) (Alito, J., concurring). As the Supreme Court reiterated just two days ago, "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Scanlan v. Coalition for Open Democracy*, 2026 WL 3167846, *1 (Oct. 22, 2026). This "*Purcell* principle" prevents "the uncertainty engendered by judicial disruptions to the status quo in the midst of elections [that] can and often will cause eligible voters to remain away from the polls." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 985 (9th Cir. 2024).

The "*Purcell* principle applies with even greater force" in circumstances like these: where the "election is not merely upcoming; it has already started." *Onder*, 2026 WL 2883222, *2. As required by California law, *supra* p. 4, the County mailed approximately 5.9 million vote-by-mail ballots to registered voters in its jurisdiction weeks ago, Dkt. 32-4 at 9, 13. And as detailed above, *supra* pp. 4-5,

once a vote-by-mail ballot is received, the Registrar simply verifies the signature on its envelope, and, if the signature is valid, removes the ballot and tabulates the vote. As of four days ago, the Registrar had completed this process for 331,000 voters. Dkt. 32-4 at 10. The only circumstance in which the Registrar may not tabulate the vote (once the signature is verified) is if a specified person contests a voter's eligibility at the place the mail ballot is being processed, *supra* pp. 4-5, based on "extraordinary proof" presented "at the time the challenge is made" that the person who cast the vote is ineligible, Cal. Elec. Code § 15106.

Yet now—with voting already underway—plaintiff seeks a court order bypassing that state scheme and imposing new elections procedures for up to 20,000 votes. That would plainly "alter the election rules of a state on the eve of an election"; indeed, it would "usher in electoral chaos." *Onder*, 2026 WL 2883222, *2. There could be no clearer case for the application of *Purcell*. Plaintiff asks this Court to impose an entirely new set of requirements for processing and tabulating ballots, in the middle of an election, that are impossible to satisfy. As the Registrar explains, segregating ballots would be a logistical and administrative nightmare: plaintiff's list does not contain the information necessary to identify voters; the Registrar has no established system for segregating ballots; and trying to create one now risks shutting down the system the Registrar needs to run the entire election. Dkt. 32-3 at 6-8, Dkt. 32-4 at 14-17.

It is also not possible to segregate ballots already tabulated: to preserve the right to a secret ballot, *see* Cal. Const., art. 2, § 7, once the signature verification process is complete, the Registrar separates the ballot from its envelope, and there is no way to identify which voter cast it, *see* Dkt. 32-4 at 8. As the top official charged with running the County's elections has concluded, it "would be virtually impossible to timely certify the election results in compliance with state law" if the requested injunction was granted. *Id.* at 4. *Purcell* exists to prevent just that result. *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (Kavanaugh, J., concurring) (*Purcell* ensures that "[w]hen an election is close at hand, the rules of the road [are] clear and settled").

Plaintiff's only response is that "California is well-equipped to provide a remedy, as it has laws on its books that facilitate the very relief sought here." Mot. 10. That grossly misunderstands California's elections regime. As explained, California law sets forth a detailed and exclusive process through which specified individuals may contest vote-by-mail voter eligibility. *Supra* pp. 4-5. No aspect of that process contemplates separating ballots upon receipt in response to third-party demands. And the sole provision of state law that plaintiff cites—California Code of Regulations, title 2, § 20363—applies only to ballots challenged during a formal "recount." *See* Cal. Code. Regs. tit. 2, div. 7, ch. 4.8. Plaintiff has not invoked that process, which is governed by a specific set of laws

that plaintiff fails to acknowledge, let alone analyze. *See* Cal. Elec. Code §§ 15600 *et seq*.

2. Plaintiff asserts "[i]rreparable harm necessarily results from enforcement of a preempted state law." Mot. 33. But as discussed above, *supra* pp. 9-11, the "mere existence" of an allegedly preempted state law does not harm plaintiff. *California*, 824 F. Supp. 3d at 1083. And even if it did, there is no such harm here, as section 611 does not preempt California's elections laws. *Supra* pp. 12-17.

Plaintiff further asserts that it will be harmed because, absent an injunction, "potentially tens of thousands" of noncitizens will vote. Mot. 33. The only evidence it offers in support is a list that, it claims, identifies over 20,000 individuals "who it reasonably believes are noncitizens registered" to vote in California. Mot. 18. But the process it used to create that list demonstrates its unreliability. It began when DHS officials received what "*appeared to be* the California voter roster . . . *as of August 2025*." Dkt. 22-3 at 5 (emphasis added). They then "enhanc[ed]" that data using an unspecified "third-party analytics and investigative platform," and "paired" that data with "an internal USCIS alien number that *may* be the same individual." Dkt. 22-4 at 2-3 (emphasis added). Next, DHS "screen[ed] all potential matches against Department of State and Social Security Administration data," before using an undefined process to "assign[] a confidence level for each match." *Id.* at 3. Officials then conducted a

"quality review" using yet another unspecified process of "enrichment using approved analytic capabilities." Dkt. 22-3 at 4-5.

This vague, light-on-details description makes plain that plaintiff's process for identifying noncitizens on the County's voter rolls is highly suspect. As the expert report submitted by one of the intervenors below explains, the process used by the federal government is likely rife with errors. Dkt. 37-2 at 4-5. Indeed, a preliminary review conducted by the Registrar reveals that, of the 20,000 names on the list, only 7,035 had Los Angeles County addresses. Dkt. 32-3 at 11. A sampling of the list indicated that 42.9% had canceled registrations, *id.* at 10, and that 38.9% recorded a U.S. birthplace, *id.* at 10-11; Dkt. 32-4 at 17. That is hardly "credible evidence" (Mot. 30) of noncitizens on voter rolls. At a minimum, by failing to provide specifics, the federal government has deprived defendants and this Court with "the information needed to independently assess the reliability of its conclusion." Dkt. 37-2 at 10.

Recent experience confirms that plaintiff's list is likely to be wildly inaccurate. In July 2026, the federal government sent a letter to Nevada, stating that it had identified 15,903 non-citizen voters as "high confidence" matches. *See, e.g.*, Levine, *Nearly 200 People Wrongly Identified on Nevada's Voter Rolls as Non-Citizens*, The Guardian (Sept. 25, 2026), https://perma.cc/2R9V-YK6A. It later reduced that number to 185 voters. *Id.* A federal court also recently

concluded that a matching process similar to the one the federal government undertook here was "plagued with inaccuracies." *Common Cause v. U.S. Dep't of Justice*, 2026 WL 3033772, *1, *26 (D.D.C. Oct. 9, 2026). That conclusion is consistent with a whistleblower's recent report that DHS created an "Unlawful Voter Initiative" to identify unlawful voters—an initiative that, among other things, relied on employees who received less than two hours of training; required those employees to review one voter record about *every 12 minutes*; based its findings on unreliable data; and erroneously swept in citizens.[3]

3. The harm of the requested injunction to California and registered voters would be extraordinary. An order requiring the Registrar to segregate and not tabulate votes risks sowing confusion and disorder in the midst of an ongoing election. It threatens to deprive 20,000 people, who attested to their eligibility under penalty of perjury, of their most "fundamental political right to vote." *Purcell*, 549 U.S. at 4. And it would undermine voters' faith in the integrity of the State's elections by signaling that their votes can be discarded based on little more than plaintiff's vague assertions that they are noncitizens. In light of the public's

---

[3] Letter from Anonymous Whistleblower to U.S. Senator Alex Padilla 1-3, https://www.padilla.senate.gov/wp-content/uploads/09.13.26-Senate-Whistleblower-Letter-DHS-USCIS_combined_signed.pdf

"deep interest in fair elections," *Lair v. Bullock*, 697 F.3d 1200, 1215 (9th Cir. 2012), the Court should deny plaintiff's baseless request for an injunction.

## CONCLUSION

The motion for an injunction pending appeal should be denied. But if the Court were to grant an injunction, it should also grant an administrative stay to preserve the status quo while California immediately seeks en banc review.

Dated: October 24, 2026

Respectfully submitted,

*/s/ Samuel P. Siegel*

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
SAMUEL P. SIEGEL
*Supervising Deputy Solicitor General*
SETH E. GOLDSTEIN
*Supervising Deputy Attorney General*
ANNE P. BELLOWS
MICHAEL S. COHEN
LISA C. EHRLICH
ANDREW E. KUSHNER
CHRISTINA M. MCCALL
*Deputy Attorneys General*
MARIAH E. MASTRODIMOS
*Associate Deputy Solicitor General*

*Attorneys for the State Defendants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,557 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font.

*/s/ Samuel P. Siegel*

SAMUEL P. SIEGEL
*Supervising Deputy Solicitor General*