No. 26-7070

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff and Appellant*,
v.
STATE OF CALIFORNIA; SHIRLEY N. WEBER, *in her official capacity as California Secretary of State*; DEAN C. LOGAN, *in his official capacity as the County of Los Angeles – Registrar-Recorder/County Clerk*,
*Defendant and Appellees*.

Appeal from the United States District Court for the Central District of California
No. 2:26-cv-12025-DOC-ADS

# OPPOSITION OF DEAN C. LOGAN TO EMERGENCY MOTION FOR INJUNCTION

DAWYN R. HARRISON
County Counsel
PETER BOLLINGER
Asst. County Counsel
EVA CHU
Snr. Dep. County Counsel
ADAM BAUMGARTEN
Snr. Dep. County Counsel
648 Kenneth Hahn Hall Of Administration
500 West Temple Street
Los Angeles, California 90012
(213) 974-0809
echu@counsel.lacounty.gov
abaumgarten@counsel.lacounty.gov

SETH P. WAXMAN
DANIEL S. VOLCHOK
Wilmer Cutler Pickering
Hale and Dorr LLP
2100 Pennsylvania Avenue N.W.

CHRISTOPHER PELHAM
ABIGAIL URQUHART
ALEX SCANDROLI
Norton Rose Fulbright
555 South Flower Street,
Forty-First Floor
Los Angeles, California 90071
(213) 892-9200
christopher.pelham@nortonrosefulbright.com
abigail.urquhart@nortonrosefulbright.com
alex.scandroli@nortonrosefulbright.com

TOBY R. MERRILL*
JOSHUA KARSH**
SHARANYA MOHAN
CHRISTINE E. BASS
KYRA SIKORA
Public Rights Project
490 43rd Street, Unit #115

Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com

M. PATRICK MOORE, JR.***
Wilmer Cutler Pickering
Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
pat.moore@wilmerhale.com

MICHAEL J. MONGAN
Wilmer Cutler Pickering
Hale and Dorr LLP
50 California Street, Suite 3600
San Francisco, California 94111
(628) 235-1000
michael.mongan@wilmerhale.com

*** Application for admission forthcoming

Oakland, California 94609
(510) 738-6788
toby.merrill@publicrightsproject.org
joshua.karsh@publicrightsproject.org
sai.mohan@publicrightsproject.org
christine.bass@publicrightsproject.org
kyra.sikora@publicrightsproject.org

* Licensed in Massachusetts and New York. Not licensed to practice law in California.

** Licensed in Illinois and Washington, D.C. Not licensed to practice law in California.

*Attorneys for Defendant-Appellee Dean C. Logan in his official capacity as the County of Los Angeles Registrar Recorder/County Clerk*

## INTRODUCTION

Appellant seeks unprecedented emergency relief: a mandatory injunction from this Court (before the District Court has even *adjudicated* its request for a temporary restraining order (TRO)) requiring the "segregation" of ballots because it says some mail ballots were (or may have been) voted by non-citizens. The purported basis for this "emergency" is that California law—in place since 2021—allows the processing of mail ballots upon receipt. Cal. Elec. Code §15101.

No injunction should issue. Indeed, as explained in a contemporaneously filed motion, this Court lacks appellate jurisdiction and hence the appeal must be dismissed. Even if the Court had jurisdiction, appellant cannot show its entitlement to the extraordinary relief of an injunction for myriad reasons. For starters, it will not likely succeed on its claim because (1) it lacks standing (as it is suffering no concrete injury); (2) under the Constitution the executive branch has no authority over elections—that power rests with States and Congress—and (3) appellant's novel implied-preemption theory fails given that state and federal law are entirely consistent in prohibiting non-citizens from voting. The remaining injunction factors also all weigh against an injunction.

## STATEMENT

### A. Factual Background

To register to vote in California, as in most States, a person certifies under penalty of perjury that he or she is a U.S. citizen. Dkt. 32-4 ¶8 (all "Dkt." cites are to the district-court docket in this matter); *see also* 52 U.S.C. §20508(b)(2). California law requires Los Angeles County to mail a vote-by-mail ("VBM") ballot to every active registered voter 29 days before the election. Dkt. 32-4 ¶19; *see* Cal. Elec. Code §3000.5. The County verifies VBM ballots by comparing voters' signatures on envelopes to signatures on file. Dkt. 32-4 ¶21.

As of October 13, the County had mailed approximately 5.9 million VBM ballots to voters, with only replacement ballots and ballots issued to new voters remaining to be mailed. Dkt. 32-4 ¶23. And for several weeks, the County has been processing VBM ballots, which are returned to the County by mail or in drop boxes. *Id.* ¶24. As of the filing of a declaration in the district court, the County had processed over 331,000 VBM ballots. *Id.*[*]

Until last week, the County had never received a request from a federal agency to attempt a "temporary ballot segregation." *Id.* ¶¶14, 36. Nor does it have authority under state or federal law to set aside the ballot of a registered voter

---

[*] Processing has of course continued since that declaration was filed. Although the current figure not in the record (and not pertinent to any argument made here), the it is estimated to be 550,000.

based on a third party's dispute of that voter's citizenship. *Id.* ¶3. That is especially true given that any such segregation would create a serious risk of irreparably denying registered voters who *are* U.S. citizens (and otherwise eligible to vote) their fundamental constitutional right to vote in the 2026 elections.

The federal government's request—that defendants create precisely this risk by indefinitely separating ballots—follows claims made by DHS Secretary Markwayne Mullin in a July letter to California's Secretary of State, Dr. Shirley Weber; Mullin asserted that a "[p]reliminary review" of California's publicly available voter data revealed that "there may be as many as 190,832 non-citizens registered to vote in California." Dkt. 1-1. Weber responded that DHS's letter "provides no detail whatsoever that [its] office can use to evaluate the veracity of your allegations," and asked for information regarding the methodology and how DHS came to possess its list. Dkt. 1-2. The United States did not respond.

On October 13, the U.S. Justice Department ("DOJ") hand-delivered a thumb drive to County of Los Angeles Registrar-Recorder/County Clerk Dean Logan asserting it contained the "names of people the Federal Government believes are likely noncitizens who were sent a [VBM] ballot." Dkt. 1-3. This list contained 20,000 names, Dkt. 22-3, ¶¶23-24—*far* fewer than the 190,000-plus in DHS's July letter. DOJ asked the County to review the October list within 48 hours; to instruct elections officials to segregate the VBM ballots of any

individuals on the list whose citizenship the County could not verify; to withhold ballots not yet sent; and not to count returned ballots "until citizenship can be determined." Dkt. 1-4.

On the morning of October 15—before the DOJ's requested 48-hour deadline—the County responded to DOJ. Dkt. 32-2, Ex. D. It noted that the October List contained addresses throughout the state (not just in L.A. County); that DOJ provided no information on how the list was compiled and failed to explain how the County could verify the listed individuals' citizenship status; that DOJ's request would violate California and federal law; and that DOJ's timeframe for these actions was not feasible. *Id.*

Ignoring the County's response, DOJ filed this action within minutes of its 9:00 am October 15 deadline, without informing the Court of the County's response. Dkt. 1. The next day, DOJ sent the County a letter that did not meaningfully address the County's concerns, instead warning that the failure to segregate ballots could constitute "aiding or abetting a federal offense." Dkt. 32-2, Ex. E.

The County has diligently attempted to analyze the data in the October List. That data includes 7,035 records bearing County addresses. Dkt. 32-3 ¶25. After comparing around 200 of those records with its voter records, the County determined that only 42.4% are active voters; less than half of them had ballots

mailed; that most of them had never voted; and over a quarter of them listed a birthplace in the United States. *Id.* ¶¶24-25; Dkt. 32-4 ¶48. Further, the list does not contain the unique identifiers the County's voter file uses, meaning any attempt to associate a name on the list with a registration record would require the matching of names, dates of birth, and addresses. Dkt. 32-4 ¶38. And any review of approximate matches would have to be performed manually by the County's most experienced voter-records staff. *Id.* ¶41. That staff, and the rest of the County's voting system, follows California law regarding the processing of returned mail ballots and accordingly does not have a system for segregating the ballots of registered voters. *Id.* ¶43. These steps would require the County to redirect key staff from the critical work of administering the November 3 election. *Id.* ¶¶38, 41.

### B. Procedural History

The one-count complaint here asserts a novel "Supremacy Clause" claim. Dkt. 1 ¶¶50–59. The claim is that 18 U.S.C. §611—a criminal prohibition on non-citizen voting—implicitly preempts any state law requiring California to process ballots received from registered voters if appellant claims that some of them may not be citizens.

The complaint states that appellant identified the individuals on its October List using unnamed "third-party software" and unexplained "analytical data

enrichment." Dkt. 1 ¶¶35, 43. Subsequent filings add that the data in the list came from an unidentified source. Dkt. 62-3 ¶¶20-21. Appellant acknowledges that the data in the list could be incomplete or wrong. Dkt. 62-2 ¶¶16-18. It specifically concedes that approximately 189 records have data discrepancies. *Id.* ¶23 & n.1; Dkt. 62-3 ¶25 n.1. The complaint asks that 20,000 ballots be segregated indefinitely based on this data. Dkt. 1 ¶¶6, 63.

The complaint was filed 19 days before election day. Under California law (in place for several election cycles), counties "may begin to process vote by mail return envelopes … not … later than 29 days before the election," Cal. Elec. Code §15101; such processing is already underway throughout the state.

Because California, like other States, has secret ballots, the processing of mail ballots involves verifying the voter's signature and then separating ballots from envelopes. Cal. Elec. Code §15101(c). This process was underway when this case was filed.

After suing, appellant waited four days to request preliminary relief. Dkt. 22. Within hours of being assigned the case, Judge Carter set a hearing for October 27. Dkt. 64. That was well before the date by which appellant's original motion demanded a ruling: November 3. *See* Dkt. 62-1 at 4. But later that day, appellant demanded even more expedited treatment, Dkt. 67, pointing to the County's statement that "[b]allots have been mailed, returned, and processed, and

election officials are working toward fixed deadlines for counting and certification," Dkt. 32-1 at 8. Claiming that this obvious and knowable statement created an emergency, as "ballot-processing practices render votes anonymous and permanently untraceable once opened," Dkt. 67 at 2, appellant demanded a temporary restraining order by noon the following day, *id.* When that deadline passed, appellant noticed this appeal claiming that its TRO request had been constructively denied. Dkt. 74.

## LEGAL STANDARDS

An injunction pending appeal, like other injunctive relief, is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). In determining whether to grant an injunction pending appeal, the Ninth Circuit applies the test for preliminary injunctions. *See Alaska Conservation Council v. U.S. Army Corps of Engineers*, 472 F.3d 1097, 1100 (9th Cir. 2006). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Moreover, mandatory injunctions, like the one sought here, should be denied "unless the facts

and law clearly favor the moving party." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

## ARGUMENT

### I. THE COURT LACKS APPELLATE JURISDICTION

As explained in the contemporaneously filed motion to dismiss, this Court does not have jurisdiction here, so the requested injunction cannot be granted because the appeal must be dismissed.

### II. APPELLANT IS NOT ENTITLED TO AN INJUNCTION PENDING APPEAL

#### A. Appellant Will Not Likely Succeed On The Merits

Three independent defects doom the merits of the appellant's claim. *First*, appellant lacks standing. It is already enforcing 18 U.S.C. §611 against individuals in the County; the County's processing and counting of ballots (in compliance with state law) does not impede that enforcement. Its remaining claimed injury—diverted federal resources and diluted votes—are self-inflicted and speculative. *Second*, the relief sought exceeds the executive branch's constitutional authority. The Elections Clause assigns the "Times, Places and Manner" of congressional elections to the States unless Congress "make[s] or alter[s]" those regulations. U.S. Const. art. I, §4, cl. 1. The only congressional enactments concerning voter rolls are the National Voter Registration Act (NVRA) and Help America Vote Act (HAVA), neither of which appellant invokes here. And there is no basis in federal

law for the executive branch to impose ballot processing steps on a state or its counties. *Third*, the appellant's sole claim, obstacle preemption, fails because state and federal law do not conflict. California law, like section 611, permits only citizens to vote. And a generally applicable federal criminal statute (like section 611) cannot displace a State's administration of its own elections absent a clear statement from Congress, which section 611 does not contain.

#### 1. Appellant lacks standing because it has shown no concrete injury traceable to defendants

To obtain the extraordinary remedy of injunctive relief, appellant must make a "'clear showing'" that it is "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Those elements include "a concrete and particularized injury caused by the defendant and redressable by the court." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Appellant has shown no concrete injury, let alone one traceable to defendants.

The asserted injury (described in a conclusory footnote, Mot.24 n.1) is to appellant's ability to enforce 18 U.S.C. §611, the federal criminal law prohibiting non-citizen voting. Dkt. 22-2 at 15. But there is no such injury. For starters, appellant *is* enforcing that law, including against voters in L.A. County. Dkt. 31-4 at 48-49. In any event, counting the ballots in question would not preclude or inhibit any section 611 prosecution; what matters to such a prosecution is simply whether the defendant actually *voted*. (If anything, it is the very relief the United

States seeks—segregating and not counting ballots—that could inhibit section 611 prosecutions, since in that circumstance a defendant could argue that the failure to count her ballot means the crime of voting, though attempted, was never actually committed.)

Logan and the County did not injure the United States when they decided to continue their voluminous ballot-processing work and administer the election as required by law rather than deploy resources to assist the United States in its voter purge: "'refusing to help [the federal government] is not the same as impeding'" it, *United States v. California*, 921 F.3d 865, 888-889 (9th Cir. 2019). Appellant's three cited field- and obstacle-preemption cases (at 24 n.1), by contrast, involve States or individuals that caused cognizable injury by affirmatively obstructing federal law enforcement. Logan and the County have taken no such actions. At most, appellant claims "an injury in law," not the "injury in fact" necessary for standing. *TransUnion LLC*, 594 U.S. at 427.

Nor do appellant's asserted collateral injuries establish standing. As to its choice to "draw federal resources from" other efforts to enforce the law (Mot.32), the government "cannot spend its way into standing." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 370 (2024). As for the asserted "dilution" of lawful votes, this Court has previously rejected similar hypothesized claims of vote dilution as insufficiently "real and immediate" to supply standing. *Lake v. Fontes*,

83 F.4th 1199, 1204 (9th Cir. 2023). It should do so again here, because appellant's claim depends on establishing that ineligible persons cast ballots that were counted, but appellant has not shown that its unadjudicated list establishes either proposition for any particular listed voter. That also precludes standing. *See Clapper v. Amnesty International USA*, 568 U.S. 398, 409-410 (2013). To be clear, the question is not whether unlawful voting would be harmful, but whether appellant has identified a concrete sovereign injury caused by these defendants and likely to be redressed by this order. Segregation would facilitate the government's preferred ballot-exclusion method; it would not remove any demonstrated impediment to federal investigation or prosecution.

#### 2. The Elections Clause gives appellant no authority to order the County to set aside ballots

The executive branch has no authority to order County officials to set aside ballots. As noted, the Elections Clause empowers *States* to prescribe the "Times, Places and Manner" of congressional elections, unless *Congress* "make[s] or alter[s]" those regulations. U.S. Const. art. I, §4, cl. 1. The executive has no similar authority. Accordingly, a federal enactment displaces state election law only "so far as [Congress] … exercise[s]" its authority "and no farther." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013) (citation omitted). The executive may therefore involve itself in the administration of elections only where Congress has authorized it.

Congress has not done so. It has given the executive branch a (defined and limited) role to enforce provisions of the NVRA and HAVA regarding the maintenance of voter rolls. *See* 52 U.S.C. §§20510(a), 21111. But that is not what appellant is doing here; this lawsuit is not about maintenance of voter rolls, nor does appellant allege that Logan or the County violated either statute, or that either provides a basis for its preemption argument. Nor does section 611 authorize the relief appellant seeks. A criminal prohibition directed at individual voters is not an implied grant of authority to impose an emergency ballot-processing regime. In short, Congress—again, the federal entity to which the Constitution gives authority to regulate federal elections—has not authorized the executive's actions here, and without such authorization appellant cannot issue orders to States and localities regarding the conduct of the elections they administer.

Given the absence of any relevant congressional regulation displacing state regulation over elections in favor of the federal executive, the Constitution provides that it is California has the power to administer elections in the State. And California already has a process for challenging mail ballots. *See* Cal. Elec. Code §15104. Appellant asks to intrude into that process—and approving that request would mean it could likewise intrude into the election processes of every state in the country. Again, Congress has not authorized it, so the Constitution

forbids it, protecting our democracy from executive overreach by preserving each State's ability to run its own elections free from meddling by the executive branch.

If more were needed to show that appellant will not succeed on its claim, the relief it seeks would violate three independent federal voting protections.

*First*, the requested relief would command what section 11(a) of the Voting Rights Act forbids. That provision bars any person acting under color of law from "willfully fail[ing] or refus[ing] to tabulate, count, and report" the vote of a person who is "entitled to vote" or "otherwise qualified to vote." 52 U.S.C. §10307(a); *see also United States v. Post*, 297 F.Supp. 46, 50 (W.D. La. 1969). Registered voters whose ineligibility has not been established remain qualified. The order appellant requests—requiring election officials to set their ballots aside indefinitely (and quite possibly long enough to deny voters their fundamental right to cast a ballot that will be counted, *e.g.*, *United States v. Classic*, 313 U.S. 299, 315 (1941)—is barred by §10307(a).

*Second*, the relief would deny procedural due process. The relevant factors are the private interest, the risk of erroneous deprivation, the value of safeguards, and the government's interest. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). The private interest is extremely high because the right to vote is among the most important of all rights. The list also contains disputed matches. The proposed order specifies no adequate notice to affected voters, response process,

adjudication standard, or deadline, Dkt. 22-8 at 6-7, and a mistaken exclusion becomes irreversible when the canvass closes. Due process would require a meaningful opportunity to address the purported basis of appellant's claim and to correct the innumerable errors the federal government concedes will be present on the October List. *See Democracy North Carolina v. North Carolina State Board of Elections*, 476 F.Supp.3d 158, 228 (M.D.N.C. 2020); *Raetzel v. Parks/Bellemont Absentee Election Board*, 762 F.Supp.1354, 1358 (D. Ariz. 1990).

*Third*, appellant's requested relief would violate the NVRA's bar on systematic removals of voters from the rolls within 90 days of a federal election. 52 U.S.C. §20507(c)(2)(A). For the November 3 elections, that period began on August 5. Appellant's list is the product of a systematic database review. To be sure, the order seeks segregation, not cancellation, but a hold that indefinitely sets aside a registered voter's otherwise valid ballot would achieve the same result. The NVRA's quiet-period protection should not be evaded by changing the label—and the quiet-period provision underscores Congress's appropriate concern with disruptive systematic reviews immediately before elections, warranting skepticism about any argument that section 611 authorizes mass ballot holds based on database inquiries. Indeed, the Department's own guidance notes that "comparing voter files to outdated or inaccurate records or databases" and "taking action that

erroneously affects a particular class of voters (such as newly naturalized citizens)" are practices that "may violate the NVRA." Dkt. 32-2 at 87.

### 3. Section 611 does not preempt California law

Appellant claims that California's adherence to its state elections code is implicitly preempted under the Supremacy Clause. The species of implied preemption on which the federal government relies (Dkt. 1 ¶54; Mot.23-24)—known as obstacle preemption—arises "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. National Solid Wastes Management Association*, 505 U.S. 88, 98 (1992) (quotation omitted). Obstacle preemption does not apply here.

*First,* obstacle preemption requires an actual—and precisely stated—conflict between state and federal law. As this Court has explained, the "mere fact that there is tension between federal and state law is not enough to establish conflict preemption." *MetroPCS California, LLC v. Picker*, 970 F.3d 1106, 1118 (9th Cir. 2020). Here, there is not even "tension," *id.*; rather, California law is fully consistent with federal law, because both bar non-citizens from voting in federal elections. Section 611 makes it "unlawful for any alien to vote" in an election to a federal office. California's constitution and statutes similarly permit only U.S. citizens to vote. *See* Cal. Const. art. II, §2; Cal. Elec. Code §2101(a)-(b). Nor has Congress otherwise given the executive any power to halt state or local ballot

processing while executive officials investigate—for some undetermined period of time—stated claims about non-citizenship. Put simply, appellant identifies no congressionally prescribed enforcement mechanism that California's ordinary ballot-processing procedures actually obstruct. There is no conflict.

*Second*, federal criminal law cannot preempt states' primary authority in election administration without a clear statement to that effect from Congress, because "[i]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460-461 (1991). Preemption, that is, does not apply without the "clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 566 (2009). The Elections Clause gives States the primary responsibility for election administration, and Congress's imposition of criminal penalties against individual non-citizens who attempt to vote is not a grant—and certainly not a "clear and manifest grant"—to the executive branch of the presently asserted authority to restructure state election administration.

Nothing in the text, structure, or legislative history of section 611 suggest that Congress intended for criminal statute to impede the ability of States to conduct elections. Appellant instead points to *the executive branch's* desire to enforce the statute. *See* Mot.31-32 ("California is obstructing the United States'

law enforcement efforts"). That desire says nothing about Congress's intent. "[T]he possibility that federal enforcement priorities might be upset" by California's administration of the election in accordance with state law "is not enough to provide a basis for preemption." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). Indeed, "the criminal law enforcement priorities or preferences of federal officers" are irrelevant to the preemption inquiry. *Id.*; *see also United States v. Texas*, 97 F.4th 268, 322 (5th Cir. 2024) (Oldham, J., dissenting) ("[A]n invocation of enforcement discretion is not enough to show preemption unless there is a specific textual basis for inferring that Congress intended to confer discretion upon a particular federal official."). Appellant's "frustrat[ion]" with California's decision not to participate in its "enforcement efforts … cannot be invalid under the doctrine of obstacle preemption where, as here, [California] retains the right of refusal." *California*, 921 F.3d at 890.

The scant precedent relied upon by appellant involves very different state action; each case involves state action that authorized, required, or financed federally forbidden conduct. *Norwood v. Harrison*, for example, held only that Mississippi violated the Equal Protection Clause by lending textbooks to private schools with racially discriminatory policies because the books were "tangible aid" to discrimination. 413 U.S. 455, 464-465 (1973). Its statement that a State may not "induce, encourage or promote private persons to accomplish what it is

constitutionally forbidden to accomplish," *id.* at 465, concerns what a State may do with its *own* resources consistent with the Equal Protection Clause, which has nothing to do with the Supremacy Clause argument raised here. In any event, counting ballots that registered voters have cast is not "tangible aid" to anyone. *Id.* at 464.

As for *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), it applied *Norwood* only to explain when a city may act to avoid financing private discrimination, *id.* at 492; it has nothing to do with preemption. Tellingly, appellant's own illustration of a preempted measure is a State that subsidizes a federal crime. Mot.24 (citing *Musta v. Mendota Heights Dental Center*, 965 N.W.2d 312, 321-27 (Minn. 2021)). The two preemption cases it cites are no different. One is quoted for the rule that a State "authorizes [persons] to engage in conduct that the federal [law] forbids." *Michigan Canners & Freezers Association, Inc. v. Agricultural Marketing & Bargaining*, 467 U.S. at 478 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The other concerned state actions "that require a private party to violate federal law," *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472, 475 (2013), thus involving impossibility preemption, a doctrine not invoked here.

Appellant's remaining theory is that California and the County "knowingly facilitate" unlawful voting because they have been given a list of "likely" non-

citizens. Mot.27. But section 611 regulates only the *individual* who illegally votes. The processing and tabulation of ballots from registered voters does not "knowingly" facilitate that conduct—whereas ordering the County to segregate ballots could "knowingly" facilitate disenfranchisement. Moreover, the list is unadjudicated, its genesis is functionally unexplained (excepting the vaguest generalities), and a federal court has called the government's citizenship records "known to be unreliable." *Common Cause v. U.S. Department of Justice*, 2026 WL 3033772, at *8 (D.D.C. Oct. 9, 2026).

### B. Appellate Will Suffer No Irreparable Harm Absent An Injunction

Appellant primarily argues that it suffers *per se* irreparable harm "from the enforcement of a preempted state law." Mot.33. But not one of the cases it cites for this proposition involves election law. That distinction matters because under the Elections Clause, federal law displaces state election procedures only "so far as" Congress has exercised its elections power "and no farther." *Inter Tribal Council of Arizona*, 570 U.S. at 9. Here, no preemption has occurred (as discussed earlier), and thus appellant has not suffered any *per se* harm.

Next, appellant claims irreparable harm "because California's mishandling of ballots cannot be undone." Mot.34. It is true that California, like all States, separates ballots from envelopes after verifying the voter's signature. Cal. Elec. Code §15101(b)(2)). But as explained, that ubiquitous and necessary system does

not harm appellant's asserted interest in enforcing section 611, which prohibits a non-U.S. citizen from "vot[ing] in any election" for certain federal offices. The evidence for a violation of section 611 lies in registration and participation records, which show who returned a ballot, and in the signed return envelope itself, which state and federal law require the County to preserve. Cal. Elec. Code §§17301-17302; 52 U.S.C. §20701. The separation of the ballot from the envelope is irrelevant to the offense.

Nor is appellant irreparably harmed by what it calls "dilution of American citizens' votes." Mot.36. Any such harm would inure to voters themselves, not to appellant. And as discussed, *see supra* p.11, this purported vote dilution stems from a "highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410. Appellant—which has the burden to establish its entitlement to an injunction—provides no sound basis to conclude that these possibilities will actually come to pass, and the County's declarations reflect their unlikelihood. *See* Dkt. 32-3 ¶24(a) (reflecting that only 42.4% of a sample of voters from the list had active voter records).

At bottom, what appellant describes as injury is simply an inability to substitute its policy preference for the Constitution's framework and the laws Congress has enacted. Congress has never required election officials to preserve the executive's ability to seize individual ballots during a purported criminal

investigation, let alone based on unverified data. And appellant rightly concedes that "a State is not required to help the Federal Government investigate and prosecute crimes." Mot.32.

In any event, California already provides a remedy if real evidence of a voting offense emerges: State law permits challenges to VBM ballots based on "the voter's qualifications to vote," including citizenship. Cal. Elec. Code §14240; *see also id.* §§15105-15106. Those challenges are adjudicated by special counting boards, *id.* §§15105, 15108, not via federally ordered ballot segregation pursuant to no constitutional or statutory authority. Observers may also challenge ballot handling, *id.* §15104(b), and California provides for post-election contests, *id.* §16100 *et seq*. The relief appellant seeks is available through those established state procedures—not through a remedy of its own making.

### C. The Equities And Public Interest Do Not Support A Preliminary Injunction

The balance-of-equities factor merges with the public-interest factor. *Nken v. Holder*, 556 U.S. 418, 435 (2009), and both weigh heavily against an injunction. Although appellant invokes election integrity, integrity is measured by whether every lawful vote is counted and whether election officials can finish their civic work without fear or threat. The requested injunction would fail on both counts: It would hold the ballots of eligible citizens with no end date. It would force the nation's largest election jurisdiction to rebuild its systems mid-count. And it

would tell officials who are counting votes, under threat of federal prosecution, that the threat works.

The consequences of granting the injunction would not end with this election, moreover. An order holding ballots on the basis of unreliable voter-roll maintenance lists would establish that any federal agency, armed with a list, may halt the count in any county in the nation. No court has endorsed that proposition, and Congress has foreclosed it. The public interest does not favor making Los Angeles County the first test case.

In short, appellant's requested relief would not further its purported interest in election integrity and stands only to irreparably harm the County's election administration systems and the constitutional rights of the voters the County serves.

Appellant asserts that ballot segregation would pose only a "de minimis" burden on the County. Mot.36. But the County's declarants say otherwise. *See* Dkt. 32-3 ¶¶3-23; Dkt. 32-4 ¶¶3, 35-49. Appellant's requested injunction would force the nation's largest election jurisdiction to rebuild its election systems—with new code, new procedures, and new training—midstream, while early voting is actively underway and less than ten days from the election. The County's procedures for provisional ballots, *see* Mot.36, could not alleviate those burdens.

Such ballots are created by statute and resolve each voter's registration record based on individualized evidence. Dkt. 32-4 ¶9.

Though appellant insists it seeks only to "segregate—not to cancel" the ballots of individuals on the October List, Mot.4, 9, its requested order would hold ballots "until the voter's citizenship status can be determined," Mot.11, 21, a determination that appellant concedes could not be made "before the 2026 election concludes," Dkt. 1 ¶60; Mot.32. That concession decides the equities: "By definition, the public interest favors permitting as many qualified voters to vote as possible." *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247-248 (4th Cir. 2014) (quotation marks omitted); *accord Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

In sum, the equities and public interest tilt decisively against any injunction because of the near-certain irreparable harm that the requested relief would inflict—denying many registered *citizens* their fundamental right to vote to the upcoming elections—and because the public's interest is in protecting that right and in not having elections in any jurisdiction (let alone in the most populous state in the country) gravely disrupted at the eleventh hour

## CONCLUSION

This appeal should be dismissed for lack of jurisdiction. If the Court concludes that it has jurisdiction, it should deny an injunction. Alternatively, the County requests a stay of any adverse decision to allow for an emergency en banc petition.

October 24, 2026

Respectfully submitted,

*/s/ Christopher Pelham*

DAWYN R. HARRISON
County Counsel
PETER BOLLINGER
Asst. County Counsel
EVA CHU
Snr. Dep. County Counsel
ADAM BAUMGARTEN
Snr. Dep. County Counsel
648 Kenneth Hahn Hall Of Admin.
500 West Temple Street
Los Angeles, California 90012
(213) 974-0809
echu@counsel.lacounty.gov
abaumgarten@counsel.lacounty.gov

SETH P. WAXMAN
DANIEL S. VOLCHOK
Wilmer Cutler Pickering
Hale and Dorr LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com

CHRISTOPHER PELHAM
ABIGAIL URQUHART
ALEX SCANDROLI
Norton Rose Fulbright
555 South Flower Street,
Forty-First Floor
Los Angeles, California 90071
(213) 892-9200
christopher.pelham@nortonrosefulbright.com
abigail.urquhart@nortonrosefulbright.com
alex.scandroli@nortonrosefulbright.com

TOBY R. MERRILL*
JOSHUA KARSH**
SHARANYA MOHAN
CHRISTINE E. BASS
KYRA SIKORA
Public Rights Project
490 43rd Street, Unit #115
Oakland, California 94609
(510) 738-6788
toby.merrill@publicrightsproject.org
joshua.karsh@publicrightsproject.org
sai.mohan@publicrightsproject.org

M. PATRICK MOORE, JR.***
Wilmer Cutler Pickering
Hale and Dorr LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
pat.moore@wilmerhale.com

MICHAEL J. MONGAN
Wilmer Cutler Pickering
Hale and Dorr LLP
50 California Street, Suite 3600
San Francisco, California 94111
(628) 235-1000
michael.mongan@wilmerhale.com

*** Application for admission forthcoming

christine.bass@publicrightsproject.org
kyra.sikora@publicrightsproject.org

* Licensed in Massachusetts and New York. Not licensed to practice law in California.

** Licensed in Illinois and Washington, D.C. Not licensed to practice law in California.

*Attorneys for Defendant-Appellee Dean C. Logan in his official capacity as the County of Los Angeles Registrar Recorder/County Clerk*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure ("FRAP") 32(a)(7)(B)(i) and Circuit Rule 32-3 because, according to the word-count feature of the word-processing system used to prepare this opposition (Microsoft Word), the opposition contains 5,219 words that count against the limit.

*/s/ Christopher Pelham*
CHRISTOPHER PELHAM

## CERTIFICATE OF SERVICE

On this 24th day of October, I electronically filed the foregoing using the Court's appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Christopher Pelham*
CHRISTOPHER PELHAM